Filed 12/12/16

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STAND UP FOR CALIFORNIA! et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br> Defendants and Respondents; <br><br> NORTH FORK RANCHERIA OF MONO INDIANS, <br><br> Intervener and Respondent. | F069302 <br><br> (Super. Ct. No. MCV062850) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County. Michael J. Jurkovich, Judge.

Snell & Wilmer, Sean M. Sherlock, Todd E. Lundell, and Brian A. Daluiso for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Sara J. Drake, Assistant Attorney General, William P. Torngren and Timothy M. Muscat, Deputy Attorneys General, for Defendants and Respondents.

Maier, Pfeffer, Kim, Geary & Cohen, John A. Maier; Wilmer, Cutler, Pickering, Hale & Dorr, Danielle Spinelli and Christopher E. Babbitt for Intervener and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINIONS**

Plaintiffs Stand Up for California! and Barbara Leach (plaintiffs) initiated this litigation by filing a complaint challenging the Governor's authority to concur in the decision of the Secretary of the United States Department of the Interior to take land in Madera County into trust for defendant North Fork Rancheria of Mono Indians (North Fork) for the purpose of operating a casino for class III gaming. The Governor's concurrence was a necessary element under federal law for the granting of permission to North Fork to operate the casino on the land. While the case was pending, the Legislature passed a statute ratifying a compact previously negotiated and executed with North Fork by the Governor. This compact is a device authorized by federal law to allow a state to agree with an Indian tribe on the terms and conditions under which gambling can take place on Indian land within the state. Plaintiffs then initiated Proposition 48, a referendum by which, at the 2014 general election, the voters disapproved the ratification statute. North Fork, having intervened, filed a cross-complaint alleging that the ratification statute was not subject to the referendum process.

North Fork and the state defendants—the Governor, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling Control, and the State of California—demurred to plaintiffs' complaint challenging the Governor's concurrence authority. Plaintiffs and the state defendants demurred to North Fork's cross-complaint challenging the referendum.

The trial court sustained all the demurrers without leave to amend. The complaint and cross-complaint were dismissed. The result was that the land remained in trust for North Fork, but the compact was not ratified, so class III gaming on the land was not approved. Subsequently, however, as a product of federal litigation between North Fork and the state, a set of procedures designed to function as an alternative to a state-approved compact was approved by the Secretary of the Interior.

Appeals were filed from both judgments of dismissal, but the parties agreed to dismiss North Fork's appeal in the case challenging the referendum, leaving only the

2.

concurrence issue. In my view, for reasons related to the lack of a state-approved compact or any future prospect of a state-approved compact for gambling on the land, any authority the Governor might have had to concur in a decision of the Secretary of the Interior to take the land into trust for purposes of gaming was inapplicable in this case, so the demurrers to plaintiffs' claims on that issue should have been overruled.

### *FACTS AND PROCEDURAL HISTORY*[1]

North Fork is a federally recognized Indian tribe with about 1,900 tribal citizens. It possesses a small rancheria in the Sierra Nevada foothills near the unincorporated community of North Fork. In March 2005, North Fork applied to the United States Department of the Interior (DOI) pursuant to the federal Indian Gaming Regulatory Act (18 U.S.C. §§ 1166-1167; 25 U.S.C. § 2701 et seq.) (IGRA) to have the federal government take into trust for North Fork's benefit a 305-acre parcel in Madera County about 40 miles from the rancheria. The parcel, owned by North Fork's development partner, is located on State Route 99 adjacent to the City of Madera. North Fork proposed building a hotel and casino on the site. Federal action taking the land into trust was a precondition to legal class III gaming under federal law. (25 U.S.C. § 2719(b)(1).) Class III gaming is the type of gambling practiced in casinos in Nevada. (25 U.S.C. § 2703(6)-(8).)

In September 2011, DOI made a finding that, within the meaning of IGRA, taking the land into trust for the purpose of gaming would be in the best interest of North Fork and would not be detrimental to the surrounding community. (25 U.S.C. § 2719(b)(1)(A).) The Governor, fulfilling a role delineated in IGRA, concurred in this determination in August 2012. (25 U.S.C. § 2719(b)(1)(A).) The Secretary of the

---

[1]North Fork's appeal, case No. F070327, has been dismissed, but I take judicial notice of the record in that case for purposes of this statement of the facts and procedural history.

3.

Interior decided to take the land into trust in November 2012, and the conveyance was completed on February 5, 2013.

Concurrently with this process, the Governor pursued a tribal-state compact under Government Code section 12012.25 and article IV, section 19, subdivision (f), of the California Constitution. Under IGRA, a tribal-state compact is one of the methods of legalizing class III gaming on Indian land. (25 U.S.C. § 2710(d)(1)(C).) In August 2012, the Governor announced that he had negotiated and signed a compact with North Fork for gaming on the 305-acre parcel and was forwarding the compact to the Legislature for ratification.

Plaintiffs filed their complaint on March 27, 2013. As amended, the complaint named as defendants the State of California, the Governor, the Attorney General, the Gambling Control Commission, and the Bureau of Gambling Control. It alleged that the Governor's concurrence in the Secretary of the Interior's determination violated the California Constitution because such a concurrence was not within the Governor's power. The complaint prayed for a writ of mandate setting aside the concurrence.

A statute ratifying the compact, designated Assembly Bill No. 277, was passed by both houses of the Legislature. The Governor signed it on July 3, 2013, and it became chapter 51 of the Statutes of 2013. In addition to ratifying the compact, the statute exempted the casino project from compliance with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). (Stats. 2013, ch. 51, § 1(b).) The compact contained provisions, however, that required North Fork to produce a tribal environmental impact report similar to a CEQA environmental impact report. The compact was forwarded to the Secretary of the Interior, who published a notice in the Federal Register on October 22, 2013, stating that the compact was approved and was taking effect to the extent it was consistent with IGRA. (78 Fed.Reg. 62649 (Oct. 22, 2013).)

In the compact, the state authorized North Fork to conduct class III gaming on the 305-acre parcel, and North Fork agreed not to conduct gaming on its environmentally sensitive rancheria or elsewhere in California. North Fork agreed to make payments to the Chukchansi Tribe to mitigate the economic impact of the new casino on the existing Chukchansi casino. North Fork also agreed to share revenue with the Wiyot Tribe in order to enable that tribe to forgo gaming on its environmentally sensitive land near Humboldt Bay National Wildlife Refuge. North Fork further agreed to participate in a revenue-sharing scheme to benefit other tribes without casinos. The compact included many additional terms, including North Fork's submission to detailed regulations for the operation of its casino.

On July 8, 2013, Cheryl Schmit, using the letterhead of Stand Up for California!, asked the Attorney General for a title and summary for a proposed statewide referendum rejecting the compact ratification statute, chapter 51 of the Statutes of 2013. The Attorney General issued the title and summary, and signatures were gathered. The referendum qualified for the November 2014 general election ballot.

North Fork, which was not originally a party to the litigation initiated by plaintiffs' complaint, was granted leave to intervene on August 23, 2013. North Fork filed its cross-complaint on February 27, 2014, naming the state defendants as cross-defendants. Schmit, the official proponent of the referendum petition, was named as a real party in interest. The cross-complaint sought a declaratory judgment stating that the referendum petition was invalid.

North Fork and the state defendants demurred to plaintiffs' complaint (alleging that the Governor's concurrence was unauthorized), and the trial court ruled on the demurrers on March 3, 2014. In its written ruling, the court stated that the Governor's power to concur arose by implication from his authority to negotiate and execute tribal-state compacts, as set forth in article IV, section 19, subdivision (f), of the California Constitution. Because the Governor was authorized to negotiate compacts for gaming on

5.

Indian land, and some such compacts, including the one at issue in this case, cannot come into effect unless the land in question is taken into trust by the federal government with the Governor's concurrence, the Governor must have the power to concur. The court rejected plaintiffs' argument that when the voters added article IV, section 19, subdivision (f), to the California Constitution via Proposition 1A in 2000, they intended to deny to the state the authority to approve Indian casinos on land that was not yet Indian land at the time, so that there could be no casinos on newly added trust land. Plaintiffs conceded they could not cure their complaint by amendment, so the demurrers were sustained without leave to amend. A defense judgment was entered on March 12, 2014.

Plaintiffs, Schmit, and the state defendants demurred to North Fork's cross-complaint (challenging the validity of the referendum), and the trial court ruled on the demurrers on June 26, 2014. The court wrote that the plain language of article II, section 9, subdivision (a), of the California Constitution was controlling. That provision states that the referendum power allows the voters to reject "statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." It was undisputed that chapter 51 of the Statutes of 2013 was a statute and not within one of those three exceptions. The court rejected North Fork's argument that the ratification of the compact was in substance administrative, not legislative, so it was not subject to referendum despite its statutory form. The court also rejected North Fork's argument that, in order to avoid a conflict between state law and IGRA, state law must be interpreted to deny the voters power to invalidate a tribal-state compact. North Fork declared it would not attempt to cure its cross-complaint by amendment, so the demurrers were sustained without leave to amend. Judgment dismissing the cross-complaint was entered on July 9, 2014.

The referendum was designated Proposition 48. A majority of voters voted "no" on Proposition 48 on November 4, 2014, thereby rejecting the Legislature's ratification of

6.

the compact.  (Historical and Statutory Notes, 32E pt. 1 West's Ann. Gov. Code (2016 supp.) foll. § 12012.59, p. 13.)

Plaintiffs appealed from the dismissal of their complaint.  North Fork appealed from the dismissal of its cross-complaint.  On May 25, 2016, however, the parties filed a stipulation to dismiss North Fork's appeal, thus removing the referendum issue from the case.  Only the question of the Governor's concurrence power remains.

On August 3, 2016, plaintiffs filed an unopposed request for judicial notice of action by DOI to approve a document called Secretarial Procedures for the North Fork Rancheria of Mono Indians (the secretarial procedures).  According to a letter from DOI included in the request for judicial notice, the secretarial procedures were issued as a remedy for North Fork in litigation in federal court.  In this litigation, as a consequence of the voters' rejection of the compact via Proposition 48, the court found the state failed to negotiate with North Fork in good faith.  This led to court-ordered mediation, which, producing no settlement, led in turn to the district court's approval a set of procedures proposed by North Fork to regulate gambling on the 305-acre site in the absence of a state-approved compact.  These procedures were submitted to DOI and, upon approval by the Secretary of the Interior, became the secretarial procedures.  The letter, dated July 29, 2016, states that the secretarial procedures are in effect.  This request for judicial notice is granted.[2]

---

[2]On August 25, 2016, this court directed the parties to submit supplemental briefing.  All parties filed supplemental briefs.  On October 4, 2016, plaintiffs filed a motion to strike portions of North Fork's supplemental brief on the ground that it cited various court opinions and other materials in which certain facts were recited.  Plaintiffs contended the facts in question were not subject to judicial notice.  No facts influencing the result in this appeal have been introduced into the record through materials cited in North Fork's supplemental brief.  Plaintiffs' motion to strike therefore is moot.

## *DISCUSSION*

### I. *Standard of review*

The standard of review is well-established:

> "In an appeal from a judgment dismissing an action after a general demurrer is sustained without leave to amend, our Supreme Court has imposed the following standard of review. 'The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]' [Citations.]." (*Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 603.)

### II. *Legal framework for Indian gaming*

IGRA was enacted in 1988. (Pub.L. No. 100-497 (Oct. 17, 1998) 102 Stat. 2467.) Its primary purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (25 U.S.C. § 2702(1).)

Under IGRA, gambling is divided into three classes. Class I is "social games solely for prizes of minimal value or traditional forms of Indian gaming" connected with "tribal ceremonies or celebrations." (25 U.S.C. § 2703(6).) On Indian lands, class I gaming is not subject to IGRA and is within the exclusive jurisdiction of Indian tribes. (25 U.S.C. § 2710(a)(1).) Class II is bingo, games similar to bingo, and certain card games. (25 U.S.C. § 2703(7).) IGRA places class II gaming on Indian lands under tribal jurisdiction in any state in which class II gaming is ever permitted by state law, subject to regulations in IGRA itself. (25 U.S.C. § 2710(b).)

8.

Class III is all other gaming. (25 U.S.C. § 2703(8).) It includes "'high-stakes casino-style' gaming" and encompasses slot machines, casino games, banking card games, dog racing and lotteries, among other things. (*Keweenaw Bay Indian Community v. United States* (6th Cir. 1998) 136 F.3d 469, 473.) IGRA permits class III gaming on Indian lands in any state in which class III gaming is ever permitted by state law, provided that the state and tribe enter into a tribal-state compact setting forth terms under which the gaming is to be conducted. (25 U.S.C. § 2710(d).)

Upon request by a tribe, a state is required to negotiate in good faith to enter into a tribal-state compact.[3] (25 U.S.C. § 2710(d)(3)(A).) After a state and a tribe enter into a compact, the compact is submitted to the Secretary of the Interior for review. The secretary has 45 days to approve or disapprove the compact; if he or she does not act within 45 days, the compact is deemed approved. The Secretary is authorized to disapprove a compact only if it fails to conform to federal law. (25 U.S.C. § 2710(d)(3)(B), (d)(8).)

IGRA provides that, in general, gaming is not authorized on land acquired by the DOI in trust for an Indian tribe after the effective date of the statute, October 17, 1988. (25 U.S.C. § 2719(a).) One exception is when "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming

---

[3]IGRA provides that if a state fails to negotiate in good faith, a tribe has a cause of action, and the federal courts have jurisdiction over that action. A federal court then can order the state and tribe to engage in a mediation process, which, if unsuccessful, leads to the approval of gaming under terms imposed by the Secretary of the Interior. (25 U.S.C. § 2710(d)(7).) In *Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 47, however, the United States Supreme Court held that a state can obtain dismissal of such a lawsuit by invoking sovereign immunity under the Eleventh Amendment.

activity is to be conducted concurs in the Secretary's determination ...." (25 U.S.C. § 2719(b)(1)(A).) This is the provision, involving what is often referred to as the two-part determination, under which the Governor concurred in the conversion of the 305-acre parcel to trust status in this case.

When IGRA was enacted, the California Constitution prohibited all casino-type gambling statewide. (Cal. Const., art. IV, § 19, subd. (e); *California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1411.) An initiative statute passed in 1998, Proposition 5, purported to authorize the state to enter into tribal-state compacts as contemplated by IGRA, but because the measure was only statutory, it was held to be invalid in light of the constitutional gambling prohibition. (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 589-590 (*Hotel Employees*).) In 2000, the voters approved Proposition 1A, which amended the California Constitution to authorize the state to enter into tribal-state compacts. (Cal. Const., art. IV, § 19, subd. (f); Historical Notes, 1E West's Ann. Cal. Const. (2012 ed.) foll. art. IV, § 19, p. 604.) The Legislature enacted Government Code section 12012.25, authorizing the Governor to negotiate and execute tribal-state compacts and requiring the Governor to submit executed compacts to the Legislature for ratification. (Gov. Code, § 12012.25, subds. (d)-(e).)[4]

## III. *Governor's concurrence power*

Plaintiffs maintain that no authority can be found in state law empowering the Governor to concur in a finding by the Secretary of the Interior that taking land into trust for an Indian tribe for gaming purposes is in the best interest of the tribe and not

---

[4]In light of the holding in *Hotel Employees, supra*, 21 Cal.4th 585, it is really the constitutional provision, not the statute, that is doing the work of authorizing tribal-state compacts in California. For this reason, in the remainder of this opinion, I will refer to Proposition 1A as the law that gives the Governor the power to negotiate and execute compacts.

10.

detrimental to the surrounding community, within the meaning of IGRA. North Fork and the state defendants argued in the trial court, and argue again now, that the Governor should be found to have this authority according to three different analyses: (1) the Governor's authority to concur arises by implication from his express authority to negotiate and execute compacts; (2) the Governor has authority to concur as part of his inherent authority as head of the executive branch of government; and (3) the Legislature impliedly ratified the concurrence when it ratified the compact, effectively supplying the Governor with authority after the fact. The trial court agreed with the first argument and did not address the others.

The parties agree that no statutory, constitutional, or other authority under state law explicitly authorizes the Governor to exercise the concurrence power contemplated by IGRA. Further, as plaintiffs point out, it has been held that any authority with which the Governor acts in granting his concurrence under IGRA must be based on state law; IGRA itself does not supply that authority:

> "When the Governor exercises authority under IGRA, the Governor is exercising state authority. If the Governor concurs, or refuses to concur, it is as a State executive, under the authority of state law. The concurrence (or lack thereof) is given effect under federal law, but the authority to act is provided by state law…. In the present case, the consequences of the Governor's exercise of discretion under state law will affect how the Secretary of the Interior will proceed to execute IGRA. No doubt, federal law provides the Governor with an opportunity to participate in the determination of whether gaming will be allowed on newly acquired trust land. But when the Governor responds to the Secretary's request for a concurrence, the Governor acts under state law, as a state executive, pursuant to state interests." (*Confederated Tribes of Siletz Indians of Oregon v. United States* (9th Cir. 1997) 110 F.3d 688, 697-698 (*Confederated Tribes*).)

The Ninth Circuit made this point to show that, when a governor concurs or refuses to concur, he or she does not exercise significant authority under federal law, and does not possess primary responsibility for protecting a federal interest, and therefore

11.

IGRA's employment of a state official to carry out a part of the statutory scheme does not violate the appointments clause of the federal Constitution. (*Confederated Tribes, supra,* 110 F.3d at pp. 696-698.) Under this reasoning, it follows that if no state law authorized the Governor to concur, then he lacked authority to do it.

In my view, the argument adopted by the trial court is indeed the most plausible of the arguments made by plaintiffs: The needed authority, if it exists, is found by implication in state law authorizing the Governor to negotiate and execute tribal-state compacts. Article IV, section 19, subdivision (f), of the California Constitution, which was added by Proposition 1A in 2000, states: "[T]he Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." The Legislature provided substantially the same authority in Government Code section 12012.25, subdivision (d): "The Governor is the designated state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the State of California pursuant to the federal Indian Gaming Regulatory Act of 1988 (18 U.S.C. Sec. 1166 to 1168, incl., and 25 U.S.C. Sec. 2701 et seq.) for the purpose of authorizing class III gaming, as defined in that act, on Indian lands within this state." In the opinion of the tribe, the state defendants and the trial court, this constitutional provision and this statute are rightly construed as empowering the Governor to concur in the Secretary of the Interior's determination under title 25 of United States Code section 2719(b)(1)(A) because of the unrestricted reference in both to "Indian lands." As I will explain, however, I need neither endorse nor reject that reasoning in this case. Even if it is correct, the Governor's implied concurrence power would not extend to lands as to which there is no state-approved compact, nor any prospect of one, since the point of the implied concurrence power would be to give effect to the state's compacting power.

12.

In interpreting a statute, our objective is "to ascertain and effectuate legislative intent." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007.)  To the extent the language in the statute may be unclear, we look to legislative history and the statutory scheme of which the statute is a part.  (*People v. Bartlett* (1990) 226 Cal.App.3d 244, 250.)  We look to the entire statutory scheme in interpreting particular provisions "so that the whole may be harmonized and retain effectiveness." (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814.)  "In the end, we '"must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]'" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.)  The same principles apply to the interpretation of a voter initiative.  Analyses and arguments contained in the official ballot pamphlet are relevant when the language of the enactment is unclear.  (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901.)

As the tribe and the state defendants point out, the term "Indian lands" includes both land on Indian reservations and land taken into trust by the federal government for the benefit of Indian tribes.  (25 U.S.C. § 2703(4).)  Trust lands include those taken into trust for gaming purposes after 1988 under title 25 of United States Code section 2719(b)(1)(A), the provision requiring the Secretary of the Interior's findings and the Governor's concurrence.  Thus, the argument goes, the Governor cannot meaningfully negotiate and execute tribal-state compacts for some Indian lands—those taken into trust after 1988 under title 25 of United States Code section 2719(b)(1)(A)— unless he can also exercise the concurrence power contemplated by that provision.  It is well established that governmental officials in California have implied power to take action necessary for the administration of powers expressly granted by law.  (*Dickey v. Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810; *Crawford v. Imperial Irrig. Dist.* (1927) 200 Cal. 318, 334; *Watt v. Smith* (1891) 89 Cal. 602, 604.)  It follows, the tribe

13.

and the state defendants aver, that the Governor must have the power to concur in a determination to take land into trust for gaming when the state's power to make a compact for gaming on that land is exercised.

The trouble for this argument in *this* case is that we now know the state's power to make a compact is *not* being exercised for gaming on the 305-acre parcel. The voters decided to reject the compact that was negotiated and ratified; the tribe has dismissed its appeal in the litigation that was designed to revive that compact; and no new compact has been proposed by any party. Instead, the casino project is poised to proceed, but for the issue in this appeal, based on the secretarial procedures, which have been imposed against the state's will.

I do not believe an implied concurrence power can be held to exist under these circumstances. Laws are deemed to have implied provisions and confer implied powers only when necessary for the carrying out of express provisions and powers. An implied power should have no greater scope than this necessity requires. "'"[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied. 'A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.'"'" (*Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 529.) It may be appropriate (there is no need to decide) to say that the Governor's concurrence power is necessary under this standard to carry out the provisions of Proposition 1A because those provisions contemplate the possibility of state-approved tribal-state compacts for class III gaming on any Indian lands as defined by law, and some such compacts (those for post-1988 trust lands) cannot be made effective without a gubernatorial concurrence in a DOI finding regarding the land in question. But it would make no sense to say the gubernatorial concurrence power arises by necessary implication from the compacting power in Proposition 1A because *secretarial procedures* that have been issued cannot meaningfully become effective

14.

unless the Governor's concurrence makes the land available. The concept of necessity limits the scope of any implied concurrence power to situations in which gambling on the land in question will be conducted pursuant to a state-approved compact, and the concurrence power is necessary to make such a compact effective. The concurrence power is not necessary to the carrying out of the compacting power in cases in which the compacting power is not being exercised.

In summary, it would be perverse to find the Governor has an implied authority based on an express power that the state has finally decided not to exercise, after protracted consideration by the Governor, the Legislature, and the voters. It is no denigration of the Governor's authority to say he cannot exercise an implied power in a case where the voters have vetoed an exercise of the express power on which the implied power is purportedly based.

The effect of this conclusion is that the Governor's concurrence for the 305-acre parcel is invalid without a state-approved compact for gaming on that parcel. Would that concurrence become valid if a new state-approved compact should come into being? It is not necessary to answer that question in this opinion.

## IV.     *Inherent authority and implied ratification*

North Fork and the state defendants argue that, even if there is no implied gubernatorial concurrence authority in the Proposition 1A compacting power, the Governor had inherent authority to give his concurrence, and the Legislature provided any missing authority by impliedly ratifying the concurrence when it ratified the compact. I turn to these arguments now.

### A.     *Inherent executive authority*

The notion that the Governor has inherent power to grant his concurrence is approached from several angles in the briefs for North Fork and the state defendants. The state defendants and North Fork both undertake to rebut the idea that there would be a separation-of-powers violation if the Governor had the concurrence power because, in

15.

exercising the concurrence power, the Governor infringes on or usurps a legislative function. The Governor's action is invalid because there is a lack of authority for it in the first place, not because the action infringes on the Legislature's domain, so there is no need to address this contention.[5] North Fork also argues, however, that the concurrence power is "[i]nherently [e]xecutive" and that the power "is a natural consequence of [the Governor's] role as the head of the administrative state." North Fork cites article V of the California Constitution, which states that "[t]he supreme executive power of this State is vested in the Governor," and "[t]he Governor shall see that the law is faithfully executed." (Cal. Const., art. V, § 1.) I understand these contentions to mean that the Governor is entitled to exercise the concurrence power contemplated by IGRA simply because he is the Governor; no specific express or implied grant of power is necessary under this view.

Among the cases cited by North Fork in connection with this argument, two seem most relevant: *United States v. 1,216.83 Acres of Land* (Wash. 1978) 574 P.2d 375 (*1,216.83 Acres*) and *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States* (7th Cir. 2004) 367 F.3d 650 (*Lac Courte Oreilles*). But neither of these shows that the Governor has inherent executive authority, independent of any specific express or implied grant of power, to issue concurrences as contemplated by IGRA.

In *1,216.83 Acres*, the question was whether the governor of the State of Washington had authority to designate the state's game commission as the agency responsible for approving federal land acquisitions for purposes of establishing migratory bird refuges pursuant to a federal statute, the Migratory Bird Conservation Act.

---

[5]For this reason, it is unnecessary to analyze *United Auburn Indian Community of the Auburn Rancheria v. Brown* (2016) 4 Cal.App.5th 36), which holds only that the Governor's exercise of the concurrence power does not violate separation-of-powers principles.

(*1,216.83 Acres, supra,* 574 P.2d at pp. 376-377.) The federal law provided that such acquisitions had to be approved by the governor or appropriate state agency in each state. (*Id.* at p. 376.) The Washington Supreme Court held that the game commission had the necessary authority to grant the approvals because a state statute expressly conferred on the commission authority to enter into agreements with the United States on all matters regarding wildlife conservation. (*Ibid.*) Then the court held that, although there was no state statute or state constitutional provision specifically authorizing the governor to designate the commission, there was implied authority in "the Governor's position as head of the executive branch of government." (*Id.* at p. 379.) Further, the Governor's authority to designate the agency was apparent "[i]n view of the extensive authority the Governor has already been given by statute over the game department and its personnel …." (*Ibid.*)

The situation in *1,216.83 Acres* is not similar to the situation here. The Migratory Bird Conservation Act called for certain action by an appropriate state agency, and a Washington statute named the agency responsible for such action. In designating that agency, the Governor of Washington merely pointed out what the state statute had already made clear. It was obvious that the governor had inherent authority to follow a state statute and direct a state agency to follow it. The Supreme Court of Washington rightly devoted only a single paragraph of analysis to this easy question. In our case, there is no state statute or other state law explicitly giving anyone responsibility for participating in the two-part determination necessary to take land into trust for gambling under IGRA. Further, even if I thought Proposition 1A impliedly gave the Governor the necessary authority in general, I would conclude that the authority is limited to land on which gambling will be conducted under a state-approved compact.

In *Lac Courte Oreilles*, the Governor of Wisconsin refused to concur in the Secretary of the Interior's two-part determination for land on which three tribes proposed to operate a casino. (*Lac Courte Oreilles, supra,* 367 F.3d at p. 653.) The tribes sued for

17.

a declaration that the concurrence requirement in IGRA was unconstitutional. (*Lac Courte Oreilles, supra,* at p. 652.) One argument the tribes made was that the concurrence provision violated principles of federalism because it required governors to create state public policy, a function state constitutions commit to state legislatures. (*Id.* at p. 664.) Rejecting this contention, the Seventh Circuit reasoned that Wisconsin already had a policy on gambling expressed in its laws authorizing a state lottery and allowing bingo and raffles by certain nonprofit organizations. (*Ibid.*) Applying *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 (*Cabazon*), the Seventh Circuit then concluded that, because the state did not prohibit all gambling, its policy was to tolerate gaming on Indian lands (since *Cabazon* held that a state cannot prohibit gaming on Indian lands if it chooses to permit any gambling elsewhere). The Governor, in deciding whether to grant or withhold a requested concurrence, thus made no new policy but was guided by the old policy and acted in a manner "typical of the executive's responsibility to render decisions based on existing policy." (*Lac Courte Oreilles, supra*, at p. 664.)

North Fork argues that, from the rationale of *Lac Courte Oreilles*, it follows that the Governor is merely acting within existing California gambling policy when he concurs in a two-part determination by the Secretary of the Interior, and therefore he needs no specific authority to do it.

I do not believe *Lac Courte Oreilles* supports this conclusion. The question in that case was whether the concurrence provision violated federalism principles because it involved the federal government compelling a governor to create state public policy, an act reserved by the state constitution to the state legislature. The answer given by the Seventh Circuit was that there was no such violation of federalism principles because, under the reasoning of *Cabazon*, the state already had a policy regarding Indian casinos, so the governor did not create a new policy by concurring or declining to concur. Under *Cabazon* and *Lac Courte Oreilles*, California would also properly be said to have a policy

regarding Indian casinos and the Governor's exercise of the concurrence power would not create that policy. This does not show, however, that the power to concur is inherent in the Governor's office. There is no rule that the Governor has inherent authority to take any action he pleases in areas in which the state has an existing public policy.

In sum, *Lac Courte Oreilles* held only that the concurrence provision does not violate the federal Constitution because it does not force governors to usurp state legislative authority by making state public policy. It did not consider the question of whether any governor has inherent executive authority to exercise the concurrence power under any state's law. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

North Fork next says there are many federal statutes that call on the Governor to take actions without specific authority under state law, and "chaos would ensue" if such specific authority were held to be required. For instance, one section of a federal law on the establishment of airports in national parks provides that the Secretary of the Interior can acquire the necessary land, but only with "the consent of the Governor of the State, and the consent of chief executive official of the State political subdivision, in which the land is located." (54 U.S.C. § 101501(c)(2).) Similarly, under the Uranium Mill Tailings Radiation Control Act, the Secretary of Energy is allowed to acquire land for radioactive materials disposal but in certain states must obtain "the consent of the Governor of such State." (42 U.S.C. § 7916.) North Fork claims there is no specific authority in California law that would allow the Governor to give consent under these statutes.

My analysis implies nothing regarding the Governor's authority to act in connection with these other federal laws. I do not go beyond the proposition that there is no concurrence power when, on the land at issue, the proposed gambling establishment would be operated under authority other than a state-approved compact. In other words, if the concurrence power exists, it is limited by the purposes of the state law in

19.

connection with which it would be exercised, that is, the purposes of Proposition 1A. Those purposes involve the legalization of gambling in casinos regulated by state-approved compacts, not those regulated by secretarial procedures imposed over the state's resistance. I think this limit would exist even if the Governor's power were supported by inherent executive authority. If a statute limits the power of the Governor, the Governor would not be entitled to exceed that limit based on the theory that the power is part of his inherent authority. So it would be, at least, if the statutory limit did not amount to an unconstitutional legislative infringement on executive authority.

In short, I draw no conclusion about whether the Governor has inherent authority to grant concurrences under IGRA in general, let alone whether he has authority to give consent to federal actions under other federal laws. I aver only that any authority he has to grant concurrences under IGRA is limited to land on which gambling will be subject to a state-approved compact.

Finally, North Fork claims the concurrence power is authorized by the Governor's statutory role as the "sole official organ of communication" between California and the United States (Gov. Code, § 12012) and his statutory authority to "require executive officers and agencies and their employees to furnish information relating to their duties" (Cal. Const., art. V, § 4). This is not persuasive. The concurrence power involves more than communication or furnishing information.

### B. *Implied ratification*

North Fork's final argument is that when the Legislature ratified the compact, it impliedly also ratified the Governor's concurrence, thereby supplying any authority that might have been lacking. This argument might have been persuasive had the compact been upheld in the 2014 election. As I have explained, however, any concurrence power the Governor possesses can operate only with respect to land on which gambling will be regulated by a state-approved compact. The voters have defeated the ratification of the compact, North Fork has withdrawn its legal challenge to the validity of the referendum,

20.

the state has declined to agree to a new compact via court-ordered mediation, secretarial procedures have been issued, and no party claims there is now any prospect of a state-approved compact for gambling on the 305-acre parcel. Even if the Governor's concurrence would have been valid otherwise, it is not valid under these circumstances.

## V.   *Dismissal of state defendants other than the Governor*

The state defendants argue that the claims against all of them except the Governor—that is, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling Control and the State of California—should be dismissed as moot because plaintiffs sought only a judgment prohibiting them from enforcing or implementing provisions of the compact. Section 8.2 of the secretarial procedures, however, gives the state the option of participating in the regulation of gambling on the 305-acre site under those procedures. In light of this, plaintiffs might still wish to pursue relief against all the state defendants and might be able to amend their complaint accordingly. Consequently, I conclude that plaintiffs' claims against these defendants are not moot.

### *DISPOSITION*

The judgment is reversed. The Governor's concurrence is invalid under the facts alleged in this case. Plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. The matter is remanded for further proceedings, and the trial court is directed to vacate its order sustaining the demurrers and enter a new order overruling them.

The request for judicial notice filed by plaintiffs on August 3, 2016, is granted.

The motion filed by plaintiffs on October 4, 2016, to strike portions of North Fork's supplemental brief is denied.

Appellants are awarded costs on appeal.

_____
Smith, J.

DETJEN, J., Concurring and Dissenting.

I join in the disposition as stated in the lead opinion.  The trial court erred in sustaining the demurrers.  I do not, however, think the analysis reaches the question of whether the Governor has "concurring" authority because, on the facts of this case, he could not exercise the limited authority to compact granted to him by article IV, section 19, subdivision (f) of the California Constitution (added by Prop. 1A, eff. Mar. 7, 2000).

This case arises from a complicated interplay between the federal law governing the acquisition and use of lands held in trust for Indian tribes, and the federal and state interests in regulating such land when used for gambling and related gaming activities.  The parties[1] initially briefed and argued a difficult question in this arena—whether, in order to execute the express constitutional authority to negotiate and conclude gaming compacts granted under Proposition 1A, the Governor has been implicitly granted the power to concur in the United States Secretary of the Interior's (Secretary) determination that it would be in the best interest of the tribe and its citizens, and not detrimental to the surrounding community, to permit gaming on Indian lands.  Upon our request, the parties submitted supplemental briefing on five questions, including whether "the failure of the 305-acre parcel to be 'Indian lands' prior to the time the Governor negotiated and executed the compact deprive[d] him of the authority to negotiate and execute the compact when he did" (italics omitted) and whether the voters' defeat of the compact ratification or the recent approval of substitute procedures for gaming by the United States Department of the Interior affected this case.

---

[1]    The parties are:  plaintiffs and appellants, Stand Up for California! and Barbara Leach (collectively, appellants); defendants and respondents, State of California, the Governor of California, the Attorney General of California, California Gambling Control Commission, and Bureau of Gambling Control (collectively, respondents); and intervener and respondent, North Fork Rancheria of Mono Indians (intervener).

Justice Smith opines state authority authorizing the Governor to concur most likely exists by implication in the language of Proposition 1A that authorizes the Governor to negotiate and execute tribal-state compacts. He concludes however that, since California voters vetoed the tribal-state compact through Proposition 48 in the November 4, 2014, General Election, the express power from which the power of concurrence could be implied no longer exists. An implied concurrence power, the analysis goes, cannot be exercised when the compact no longer exists.

Justice Franson concludes no state authority authorizes the Governor to concur; it is neither stated in nor implied from Proposition 1A.**2** He opines an implied grant of that power is not necessary under the principles of California law. He does not believe the authority can be found in general executive power.

---

**2**    Justice Franson's concurrence and dissent attempts to completely resolve the scope of the Governor's concurring power by claiming the average voter would not have understood Proposition 1A to resolve the controversial issue of off-reservation casinos. (Conc. & dis. opn. of Franson, J., *post*, at pp. 2-3.) The issue before us is not so broad, being limited to whether the Governor has concurring power in the context of land not yet taken into trust. To the extent Justice Franson's position is premised on the notion no power to concur could be intoned from Proposition 1A because the proposition did not affect off-reservation casinos, I disagree. The Indian Gaming Regulation Act (IGRA) wholly bans class III gaming on Indian lands in states which do not permit such gaming "by any person, organization, or entity." (25 U.S.C.S. § 2710(d)(1)(B).) As discussed, *post*, by passing Proposition 1A the voters opened California to gaming under the IGRA. Justice Franson's recitation of the full scope of the IGRA's gaming provisions shows this authorization resolved whether off-reservation casinos would be permitted on lands not subject to the concurrence provisions at issue here by allowing the Governor to compact for, and thus approve, casinos on lands taken into trust at any time that are contiguous to the boundaries of Indian reservations; on lands taken as part of a settlement of a land claim; on lands obtained through restoration; and on lands held by an Indian tribe or individual subject to restriction by the United States against alienation. (25 U.S.C.S. §§ 2703(4); 2719(a), (b).) In light of the limited scope of the alleged facts in this case, it is unnecessary to conclude Proposition 1A cannot support any form of concurring power, particularly in the context of lands held in trust for non-gaming purposes which would require a concurrence to permit future gaming. I take no position on that issue and therefore cannot agree with Justice Franson's broader conclusions.

2

In arguing the issues, the parties initially assumed the Governor was appropriately exercising the authority granted under Proposition 1A to negotiate gaming compacts in the first instance. In the supplemental briefing, appellants asserted the Governor lacked authority to compact in the first instance. Due to the unique structure of California's constitutional provisions regarding casino-style gaming, I believe this later position is correct.

## OVERVIEW OF THE RELEVANT LAW

"The Indian Reorganization Act . . . authorizes the Secretary . . . to acquire land and hold it in trust 'for the purpose of providing land for Indians.' " (*Carcieri v. Salazar* (2009) 555 U.S. 379, 381-382.) The operative statute for this authority is 25 United States Code Service section 5108 (formerly, 25 U.S.C. § 465), which provides that the "Secretary . . . is . . . authorized, in his [or her] discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments[,] whether the allottee be living or deceased, for the purpose of providing land for Indians."

As with many federal laws, there are additional federal regulations delineating how this authority will be exercised. In the case of accepting land into trust, these regulations are detailed at 25 Code of Federal Regulations parts 151.1 through 151.15. Under part 151.3, "land may be acquired for a tribe in trust status" in three circumstances: (1) when the property is "located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area"; (2) when "the tribe already owns an interest in the land"; or (3) when the Secretary . . . "determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." With respect to accepting off-reservation land offered into trust under the third basis, the Secretary is guided by part 151.11, which lists several factors to consider, including the need of the tribe for the land, the purposes

3

for which the land will be used, the impact on the state from removing the land from the tax rolls, potential conflicts of land use which may arise, the location of the land relative to state boundaries and the boundaries of the tribe's reservation, and, in the case where land is being acquired for business purposes, the tribe's plan specifying the anticipated economic benefits associated with the proposed use. (25 C.F.R. § 151.11(a)-(c) [incorporating 25 C.F.R. § 151.10(a)-(c) & (e)-(f)].)

Comparatively, the primary purpose of the Indian Gaming Regulatory Act (IGRA) is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (25 U.S.C.S. § 2702(1).) Generally, class III gaming activities "shall be lawful on Indian lands" only when they are authorized by the tribe and approved by the Chairman of the Indian Gaming Commission, "located in a State that permits such gaming for any purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." (*Id*., § 2710(d)(1).) Under the IGRA, any tribe "having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact." (25 U.S.C.S. § 2710(d)(3).) The IGRA specifically defines " 'Indian lands' " as all land within the limits of any Indian reservation and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power." (25 U.S.C.S. § 2703(4).)

However, the IGRA excludes any land taken into trust after October 17, 1988, from being used for gaming purposes unless certain exceptions apply. (25 U.S.C.S. § 2719(a).) Relevant here, land taken into trust after October 17, 1988, which is not otherwise permitted to be used for gaming by the IGRA, may be converted to such use if "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming

4

establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." (25 U.S.C.S. § 2719(b)(1)(A).)

Like the Indian Reorganization Act (IRA), the IGRA is also the subject of multiple federal regulations. (25 C.F.R. §§ 292.1-292.26.) Relevant to this appeal, the regulations define the phrase "[n]ewly acquired lands" as "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988." (25 C.F.R. § 292.2.) The regulations allow the Secretary to streamline the process for taking lands into trust for the purpose of allowing gaming to occur. The regulations demonstrate, however, that taking land into trust and allowing gaming to occur remain two separate processes. (See *id*., §§ 292.3(b) ["If the tribe seeks to game on newly acquired lands that require a land-into-trust application . . . the tribe must submit a request for an opinion to the Office of Indian Gaming."]; 292.15 ["A tribe can apply for a Secretarial Determination under § 292.13 for land not yet held in trust at the same time that it applies under part 151 of this chapter to have the land taken into trust."].) Indeed, if in these dual processes, the Secretary notices an intent to take the land into trust for gaming purposes, but the Governor of the affected state issues a written non-concurrence, "the Secretary will withdraw that notice pending a revised application for a non-gaming purpose" and the land will not be taken into trust. (*Id*., § 292.23(a)(2).) If the land is already in trust or otherwise under control of the tribe, the tribe "may use the newly acquired lands only for non-gaming purposes." (*Id*., § 292.23(a)(1).)

California's Constitution generally bans what is categorized as class III gaming under the IGRA. (Cal. Const., art. IV, § 19, subd. (e) ["The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey."].) As our Supreme Court explained: "In 1984, the people of California amended our Constitution to state a fundamental public policy against the legalization in California

5

of casino gambling of the sort then associated with Las Vegas and Atlantic City." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 589 (*Hotel Employees*).) This prohibition led to the downfall of the first attempt to permit class III gaming on Indian land in California: Proposition 5. That proposition, which attempted to grant a statutory procedure for authorizing gaming on Indian lands, was held invalid[3] in the face of California's constitutional ban on casinos. (*Hotel Employees*, *supra*, 21 Cal.4th at p. 615.) In response, the California Constitution was amended through Proposition 1A.

Proposition 1A added article IV, section 19, subdivision (f), to the California Constitution: "Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts."

## DISCUSSION

The core issue in this case is the effect of Proposition 1A. The parties and my colleagues appear to agree that, if no state authority grants the Governor power to concur in the Secretary's determination, then the Governor has no authority to concur. (See *Confederated Tribes of Siletz Indians v. U.S.* (9th Cir. 1997) 110 F.3d 688, 697-698 (*Confederated Tribes*) [noting the Governor acts under the authority of state law].)

My colleagues then split on whether the authority to concur in the Secretary's determination that newly acquired land is suitable for gaming is implied from the

---

[3] With the exception of the final sentence of Government Code section 98005, not relevant here.

6

Governor's compacting authority under Proposition 1A, with the lead opinion avoiding the impact of that split by relying on a later revocation of the compact by voters. This analysis is one step too far down the road. Under the facts alleged in the complaint, appellants could state a legitimate claim that the Governor exceeded any constitutionally granted authority when concurring because, even if the power to concur was necessary to or implied within the authority to compact, the Governor was not properly executing the authority to compact.

Given that the Governor may only compact or concur if authorized under State law, a point discussed more fully, *post*, and that without authorization to act the California Constitution bars any conduct which would create Nevada- or New Jersey-style casinos, the meaning of the law defining the Governor's authority is of paramount importance. (*Hotel Employees*, *supra*, 21 Cal.4th at p. 589; *Confederated Tribes*, *supra*, 110 F.3d at pp. 697-698.) The basic principles of statutory interpretation must therefore, in the first instance, be applied to the scope of the Governor's authority under Proposition 1A.

I.       *Grammatical Structure of the Governor's Compacting Authority.*

Proposition 1A grants a narrow and specific constitutional authority, providing the Governor "is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).) By applying some non-substantive simplifications,[4] the following sentence diagram can be generated:

---

[4]       These simplifications generally reduce the sentence to its non-redundant parts. In this process, the ratification clause is irrelevant to the issue at hand and can be completely eliminated. The "operation" and "conduct" phrases can be combined to simply authorize the operation of slot machines, as the remaining games are redundant with respect to the analysis. Likewise, "negotiate and conclude" can be expressed simply



This shows the Governor's authority to negotiate compacts was substantially limited.  The Governor's compacting authority was limited in both the scope of gaming the compacts could grant, and the groups that could conduct that gaming, to "the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes" (Cal. Const., art. IV, § 19, subd. (f)), which corresponds roughly to the class III gaming permitted by the IGRA.  It was also limited as to where the Governor could compact for that gaming to occur, namely "on Indian lands in California."  (Cal. Const., art. IV, § 19, subd. (f).)  And it was limited such that the compacts and restrictions must be considered "in accordance with federal law."  (*Ibid*.)  In this case, it is the restriction to compacting for operations on Indian lands which precludes the Governor's actions under the alleged facts of this case.

II.     *The Meaning of "Indian lands" as Used in Proposition 1A.*

There is no direct definition of "Indian lands" in Proposition 1A.  However, as is apparent from the general legal framework governing this issue, the proposition is readily

as "negotiate."  And the copular phrase "is authorized to" can be succinctly stated as the modal verb "may" without causing any harm to the section's meaning.  (Garner, Garner's Modern English Usage (4th ed. 2016) pp. 113 ["Verb phrases containing *be*-verbs are often merely roundabout ways of saying something better said with a simple verb. . . .  [¶] . . . [¶]  Many such wordy constructions are more naturally phrased in the present-tense singular:  . . . *is authorized to* (*may*) . . . ."], 221 [defining copula as "(1) a linking verb, such as *be*, *feel*, or *seem*, that expresses a state of being rather than action; or (2) a link or connection in general"].)

understood to reference the IGRA through its specific provisions, its reference to allowing gaming operations "in accordance with federal law," and its enactment following the failure of Proposition 5.  (See *Flynt v. California Gambling Control Com.* (2002) 104 Cal.App.4th 1125, 1132-1137 [outlining the history of Indian gaming in California].)  Indeed, the analysis by the Legislative Analyst for Proposition 1A preceded its explanation of how the changes proposed by Proposition 1A would affect gaming in California with a detailed explanation of how gaming regulations under the IGRA worked.  Partially in light of this history, respondents concede that, in this appeal, "article IV, section 19, subdivision (f)'s plain meaning is to authorize the Governor to negotiate compacts for certain forms of otherwise illegal class III gaming to be conducted on Indian lands in California pursuant to IGRA."  As intervener puts it, the "history of Proposition 1A indicates that (1) the Governor may act 'in accordance with federal law' and (2) Indian tribes may conduct gaming on 'Indian lands' as that term is defined in IGRA . . . ."

I agree with respondents that, given the history of Proposition 1A, the term "Indian lands" should be understood to have the same meaning as used in the IGRA.  And, turning to the IGRA, there is, in fact, a definition of "Indian lands" to apply.  As noted above, this definition covers all land within the limits of any Indian reservation and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power."  (25 U.S.C.S. § 2703(4).)  Under this definition, the Governor's authority under Proposition 1A is limited to compacting for gaming on lands held in trust by the United States and over which an Indian tribe exercises governmental power.

      III.     *Proposition 1A is a Conditional Authorization of Authority.*

Given that the Legislature faces a blanket constitutional prohibition on authorizing Nevada- and New Jersey-style casinos under article IV, section 19, subdivision (e), of the state Constitution subject only to a limited compacting authority delegated to the

9

Governor for such gaming on trust lands pursuant to subdivision (f), the notion that the Governor is vested with a broad authority to negotiate any compact which could ultimately result in gaming on later-created Indian lands (and has the concurring authority to enact those compacts) is difficult to defend. In support of this claim, respondents and intervener argue that a restriction on the Governor's authority requiring the existence of "Indian lands" operates as an improper temporal limitation. As intervener further argues, the disputed provision "is a limitation on the *content* of compacts, not the *time* during which the Governor may negotiate and conclude the compacts."

Although this argument generally contradicts the grammatical structure of the sentence which naturally reads such that the prepositional phrase "on Indian lands" modifies "for the operation" as opposed to "compacts," in the abstract one could argue, as respondents and intervener do, that the language is simply a limitation on where the operation of slot machines must ultimately occur and not a limitation on the Governor's authority to act in the first instance. However, such an argument ignores a key component of statutory construction – the contested terms must be understood both in the context of the section as a whole and in its contemporary legal context. (*Graham County v. United States ex rel. Wilson* (2005) 545 U.S. 409, 415 [explaining that "[s]tatutory language has meaning only in context"]; Stevens, Essay: The Shakespeare Canon of Statutory Construction (1992) 140 U.Pa. L.Rev. 1373, 1374-1381 [describing the first three cannons of statutory interpretation as " 'Read the statute,' " " 'Read the entire statute,' " and ensure "that the text be read in its contemporary context,"] italics omitted.)

In the broader context of article IV, section 19, subdivision (f) of the state Constitution is a limited authorization of authority carved out of a blanket prohibition. And in the broader social context, subdivision (f) was only enacted through Proposition 1A because other attempts to grant Indian tribes the authority to engage in gaming on Indian lands had been overturned by the California Supreme Court. Thus, the suggestion the Governor's compacting authority is ever-present, provided that what is negotiated

10

satisfies the authorizing statute at the time of implementation, runs contrary to the broader section's text and the contemporary purpose for enacting Proposition 1A. The disputed limitation on the Governor's authority to act is not temporal but conditional.

In other words, the fact the Governor's authority can only be exercised when the conditions triggering that authority are met is not a temporal restriction on an existing authority. Like other conditional powers, the Governor's authority only exists upon satisfying the condition needed to bring the right to act into existence. (Cf. *Board of Trustees v. Garrett* (2001) 531 U.S. 356, 374 ["Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation."]; *City of Boerne v. Flores* (1997) 521 U.S. 507, 517-520 [positive grant of legislative power to enforce 14th Amend. cannot be exercised unless record shows Congress is acting within that power by passing appropriate legislation]; see *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. U.S.* (7th Cir. 2004) 367 F.3d 650, 656-657 (*Lac Courte Oreilles*) [explaining how the IGRA is a conditional statute, where the authority to act requires certain factual predicates to exist before the Secretary may proceed (i.e. – the Secretary could not agree to take land into trust on the assumption that, by the time the act was complete, the Governor would concur)].) As an example, picture a pet-sitting business. Assume a client says to the business, "You may take my dog for a walk on the sidewalk." The most natural reading of this command is that the business is not permitted to take the dog for a walk unless that walk occurs on a sidewalk. If there is no sidewalk on which to walk, the business lacks authority to take the dog. If the business prepares for a walk, believing there is a sidewalk outside, it risks the possibility of being wrong and thus lacking authority to take the dog on a walk. And if the business nonetheless proceeds to take the dog on a walk, expecting a sidewalk to appear around the corner, the business has begun

11

the walk without authority. Here too, while the Governor may wish to proceed with a compact, expecting Indian lands to appear prior to any gaming occurring, the Governor will be acting without authority at all times there are no Indian lands because the condition necessary to trigger the Governor's authority to compact has not arisen.

IV.    *On the Facts Pled, the Governor Could Not Exercise His Compacting Authority.*

Having determined the initial limits of the Governor's compacting authority under Proposition 1A, the question becomes whether the complaint "has stated a cause of action under any legal theory." (*Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 603.) The relevant facts, as set forth throughout the first amended complaint, are as follows:

On March 1, 2005, intervener applied to have "the Madera [s]ite taken into trust for the purposes of conducting class III gaming." By letter dated September 1, 2011, the Assistant Secretary for Indian Affairs noted a favorable determination under the two-part analysis required by 25 United States Code Service section 2719 had been reached and requested the Governor concur. On August 31, 2012, the Governor responded by letter, concurring. When the Governor issued this concurrence letter, "he also announced that he had already negotiated a Compact with the Tribe." The complaint then alleges the Governor's concurrence "exceeded his authority under state law."

Although the focus of the complaint is clearly on the Governor's power to concur, the facts detailed above are sufficient to demonstrate the Governor exceeded the authority granted under state law as alleged. This is so because the Governor was alleged to have negotiated a compact for gaming on lands that were not "Indian lands."[5] At the time the

---

[5] Further facts developed in the record show that the Secretary only took the Madera property into trust after receiving the Governor's letter. As expected, it did so "pursuant to the [IRA], 25 [United States Code Service section 5108, formerly United States Code section] 465, and its implementing regulations at 25 [Code of Federal Regulations p]art 151[.1 et seq.]" However, this fact did not necessarily need to be pled to state a cause of

12

Governor negotiated the compact and gave the disputed concurrence, the Secretary had not accepted the Madera property into trust under the only authority permitting such conduct, 25 United States Code Service section 5108. Without this acceptance, the land cannot be considered as held in trust by the United States. (25 C.F.R. § 151.3 ["No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary."].) Because the land was not held in trust at the time the Governor negotiated the announced compact, the Governor was not negotiating a compact for gaming on Indian lands and, thus, exceeded any authority granted by Proposition 1A.

V. *The Parties' Framing of this Issue.*

The parties have framed this issue in the context of the Governor's power to concur in light of the constitutional power to compact, disputing whether such power would grant the Governor the ability to take lands from California for Indian use, thereby usurping the Legislature's role in setting public policy and resolving land use issues. As appellants argued, the "primary issue in this appeal is whether the Governor has authority to authorize the Secretary to create new Indian land in California for the purposes of gaming by concurring in the Secretary's two-part determination." While respondents generally worked to rebut appellants' claims, they too suggested authorization in the Governor to concur in the taking of lands into trust under the IGRA, writing: "When a tribe seeks a compact for gaming on Indian lands that are not taken into trust through the Secretary's powers under 25 [United States Code Service section] 2719(b)(1)(A), a gubernatorial concurrence is not required." It further directed the issue to this point by

---

action, as the complaint directly alleged the Madera property was not in trust when the application was made and did not indicate it had gone into trust at any point prior to the Governor's concurrence.

13

arguing that "[a]s long as Indian lands are established 'in accordance with federal law,' meaning IGRA, those lands become eligible for gaming."[6]

I agree with the general idea that the historical exclusion of casino gaming in California coupled with the history of Proposition 1A would not inform a voter that Proposition 1A was granting to the Governor the concurring authority to convert non-Indian land to Indian land in a manner which would authorize Nevada- or New Jersey-style casinos.

As the summary of the various laws and regulations show, however, this framing misses the mark. There is no provision of law in the IGRA which permits the Secretary to take lands into trust. The trust determination is wholly driven by the provisions of the IRA. And, while regulations may allow both proceedings to progress in tandem, the authority to concur in a determination that "newly acquired lands" are suitable for gaming purposes in no way grants the Secretary a right to take the land into trust under the IRA. At most, such a concurrence would support the Secretary's determination that taking the land into trust would benefit the tribe because gaming would not be blocked at a later date and, thus, the economic impacts of the decision would be clearer.

All parties appear to recognize this fact, at least implicitly, at some point in their briefing. For example, respondents explain in their summary of the law, that while "the IRA governs federal action to take land into trust for Indian tribes, IGRA governs a federal decision to allow such trust land's use" for gaming purposes. Likewise,

---

[6] To intervener's credit, it generally kept the issues separate (despite wrongly claiming that 25 U.S.C.S. § 2703(4) defines " 'Indian lands' " to include "lands acquired through two-part determination") contending "the Governor does not unilaterally make new policy or exercise plenary power to create new Indian land when concurring in the Secretary's determination" while arguing the trial court correctly concluded "the California Constitution grants the Governor authority to concur in the Secretary of the Interior's two-part determination to permit gaming on Indian lands acquired by the Secretary after 1988 . . . ." Intervener does not, however, explain how the Madera property qualified as "Indian lands" under the facts of this case.

14

intervener clearly explains that the IRA "governs the federal government's acquisition of land for the benefit of Indian tribes" while the IGRA aims only to "facilitate 'the operation of gaming by Indian tribes.' " This split in framing and understanding appears to arise from a conflict that may be unique to California and derives from California's start and stop history in regulating Indian gaming.

In the federal regulatory scheme, the Secretary is permitted to conduct analyses with respect to the suitability of gaming on "newly acquired lands." (25 U.S.C.S. § 2719(b)(1)(A); 25 C.F.R. § 292.13.) By regulatory definition, such lands include not only those already held in trust, but also those that "will be taken" into trust. (25 C.F.R. § 292.2.) In contrast, California's Proposition 1A arose in part as a mechanism to ratify several previously negotiated compacts. (*California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1412.) In doing so, it approved the Governor's prior unauthorized compacting, weakened the constitutional restriction on the Legislature's authority to permit Nevada- and New Jersey-style casinos, and delegated compact power to the Governor, subject to ratification by the Legislature. As part of this change, Proposition 1A tightly limited the Governor's future authority to compact such that he could only negotiate for gaming "on Indian lands." (Cal. Const., art. IV, § 19, subd. (f).) In this way, California's Constitution was amended to grant the Governor a right to compact which covers only half of the potential proceedings occurring under the federal regulatory scheme.[7, 8]

---

**7** It appears appellants may have belatedly recognized this fact in their reply brief. There appellants complained respondents' argument that the "concurrence was authorized because the concurrence is the mechanism under federal law by which the land in question here would become Indian land on which gaming could occur" was "circular," explaining the "existence of Indian land on which gaming can occur *is the precondition to* the Governor's authority to negotiate a compact pursuant to which such gaming on that land would be regulated." Appellants, however, fully embraced this limitation in their supplemental briefing.

15

It must be noted that the Seventh Circuit, in *Lac Courte Oreilles*, *supra*, 367 F.3d at page 656, wrote, "Unless and until the appropriate governor issues a concurrence, the Secretary of the Interior has no authority under [25 United States Code Service section] 2719(b)(1)(A) to take land into trust for the benefit of an Indian tribe for the purpose of the operation of a gaming establishment." While this statement would appear to contradict the prior analysis, I find it distinguishable on at least three grounds.

First, the issue under consideration in *Lac Courte Oreilles* was whether the IGRA's concurrence provision was an unconstitutional violation of the separation of powers doctrine. (*Lac Courte Oreilles*, *supra*, 367 F.3d at p. 655.) The court's understanding of the basis for invoking the request for concurrence, as authority to take the land into trust or authority to permit gaming on newly acquired land, was therefore immaterial to the resolution, rendering this analysis dicta. Indeed, the court used the above statement in order to analogize the legislation to other examples of "contingent legislation" which had been held constitutional. (*Id.* at p. 656.)

Second, the factual scenario considered in *Lac Courte Oreilles* was different in a material way. In *Lac Courte Oreilles*, the Governor had declined to concur in the Secretary's findings, precluding the requested authorization for gaming and triggering a dispute concerning the Governor's authority to affect federal law. (*Lac Courte Oreilles*,

---

**8**　　I recognize that the interplay of the various regulatory schemes creates the potential for significant gubernatorial power over the placement of class III gaming facilities within California should the Governor have authority to concur once lands are Indian lands. While the Governor has no direct role in determining which lands are taken into trust, there appears to be no legal reason why the Secretary could not take lands into trust for the purpose of providing future revenue as a gaming location or other similar reason. Once the lands are in trust, the Governor would appear to have both the power to negotiate compacts under state law and the power to preclude gaming by withholding his necessary concurrence under federal law, thereby precluding gaming under a federal compact. Whether this was the desired outcome of the electorate when passing Proposition 1A is not before us. Regardless, it is the province of the Legislature to resolve any unintended consequences.

16

*supra*, 367 F.3d at p. 653.)  As such there was no detailed discussion of Wisconsin's laws or policies with respect to the Governor's authority to act.  In contrast, here the Governor concurred with the Secretary, triggering a different dispute concerning whether, under California law, the Governor had the authority to issue that concurrence.

Finally, and most importantly, the court's statement in *Lac Courte Oreilles* is not accurate.  There is no technical reason under the law, provided the proper Administrative Procedure Act (APA) requirements are met, that the Secretary could not take land into trust for the purpose of gaming without the Governor's concurrence.[9]  This is so because the authority to act arises under 25 United States Code Service section 5108 and not section 2719.  Should the Secretary so act and survive the likely challenge under the APA, however, 25 United States Code Service section 2719 would still bar class II or III gaming on the property unless and until an exception applied – such as the Governor's concurrence provision.  Thus, in the context of a dispute arising when a request for a trust determination was made under 25 United States Code Service section 5108 at the same time as a request for a determination that the newly acquired property is suitable for gaming under 25 United States Code Service section 2719, it would be understandable, though not wholly correct, to claim the property could not be taken into trust for the purpose of gaming unless the Governor concurred.  To the extent *Lac Courte Oreilles* suggests the Governor's concurrence is required to take land into trust, I do not find it persuasive authority.

VI.     *The Governor's Executive Authority.*

---

[9]     This is particularly true if the land is taken into trust for class I gaming, which is not regulated by the IGRA and thus not subject to the post-1988 Indian land gaming prohibition.  (See 25 U.S.C.S. §§ 2710(a)(1) ["Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this act."]; 2719(a) ["Except as provided in subsection (b), gaming regulated by this act shall not be conducted on lands acquired by the Secretary . . . ."].)

17

The Governor's concurrence could still be accepted as valid in this case if the Governor held the authority to concur as a power inherent to the chief executive of the state. I concur with and join Justice Franson's conclusion that no such authority exists. I find persuasive his analysis showing that the California Constitution expressly bans the creation of Nevada- or New Jersey-style casinos. (Cal. Const., art. IV, § 19, subd. (e).)

This general prohibition demonstrates forcefully that the Governor does not possess the power to act in a manner which would result in the authorization to operate Nevada- or New Jersey-style casinos within California absent some express grant of that right. While it is true the Governor's concurrence does not, by itself, create permission to operate such casinos in California, that authority being expressly found only in the Secretary, there can be no doubt the practical effect is the same. (See *Lac Courte Oreilles*, *supra*, 367 F.3d at p. 663 [rejecting argument that impact of gubernatorial inaction violated federalism principles because federal government could grant states input into execution of federal law]; *Confederated Tribes*, *supra*, 110 F.3d at p. 698 [noting that Secretary must comply with guidelines expressed by Congress and that Governor plays limited role by concurring once the Secretary has determined gaming would be appropriate].) At the time the Secretary requests concurrence, a preliminary determination that operation of class III gaming on the identified lands is appropriate has already been reached. (See 25 C.F.R. § 292.13; *Lac Courte Oreilles*, *supra*, 367 F.3d at p. 663 [explaining that due to the transparent nature of the IGRA, "if the Secretary of the Interior issues a favorable finding, but ultimately denies the application, the constituents will gather that the governor likely declined to issue a concurrence"].) Given that the California Constitution expressly forbids the authorization of such gaming, and that the exception created by Proposition 1A only applies to "Indian lands," there can be no

18

inherent authority in the Governor to concur in the conclusion that gaming may occur on "newly acquired lands" which are not already in trust.[10]

I also find this constitutional prohibition is confirmation that the underlying authority to concur in the Secretary's determination to authorize Nevada- or New Jersey-style casinos on newly acquired lands is inherently and wholly legislative. By expressly removing the authority to authorize Nevada- and New-Jersey style casinos from within the broad plenary powers of the Legislature, then placing partial authority to compact for such casinos with the Governor, subject to express ratification from the Legislature, the California Constitution leaves no doubt that the authority to authorize such casinos cannot exist within the Governor's inherent executive authority. During our consideration of this case, another court of appeal reached a contradictory result in *United Auburn Indian Community of Auburn Rancheria v. Brown* (2016) 4 Cal.App.5th 36 (*United Auburn*). *United Auburn* reviewed three general legislative spheres and found the Governor's concurring power did not fall exclusively within any of those three. (*Id.* at pp. 47-51.) Then, relying on *Lac Courte Oreilles*, the court determined the concurring power had some "[e]xecutive [c]haracteristics," while failing to expressly call it an executive power, because it allegedly involves the implementation of existing Indian gaming policy in California. (*United Auburn*, *supra*, 4 Cal.App.5th at pp. 51-52.) I am not persuaded by this analysis.

---

**10** Due to the expressly stated policy against such gaming, this is not a case, as intervener suggests, where the Governor is acting in the face of silence. The People of California amended the state Constitution in a manner that excludes any assertion of inherent authority and, indeed, respondents do not rely on this justification in their own briefing. For similar reasons, I find intervener's reliance on *United States v. 1216.83 Acres of Land* (Wash. 1978) 574 P.2d 375, 379 misplaced. Unlike *1216.83 Acres of Land*, where broad powers were granted to the Governor to control the consenting agency and its policies, the policy outlined in California's Constitution is directly opposed to the Governor's conduct in this case, limiting his ability to act.

19

As the court in *United Auburn* noted, case law in California stands "for the unremarkable proposition that the Governor may not exercise a legislative power without express authority from the Legislature." (*United Auburn*, *supra*, 4 Cal.App.5th at p. 47.) California's constitutional ban on the legislative authority to authorize gaming and the later amendment granting limited powers to the Governor in that context demonstrates forcefully that this proposition is the controlling law. Yet, *United Auburn* makes no reference to this history or its implication.

Similarly, *United Auburn*'s reliance on *Lac Courte Oreilles* to conclude concurring has an executive characteristic under California law is misplaced. As *United Auburn* noted, *Lac Courte Oreilles* found extensive gaming regulations in Wisconsin meant there was a general policy, consistent with the Wisconsin Constitution, which the Governor was simply enforcing. (*United Auburn*, *supra*, 4 Cal.App.5th at pp. 51-52.) *Lac Courte Oreilles* conducted its analysis by following an earlier United States Supreme Court case considering California's authorization of bingo. In that case, *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 (*Cabazon*), the Supreme Court noted that California allowed several forms of gambling to occur, including bingo and the card games being operated by the tribe, but had sought to criminalize high stakes, unregulated bingo. (*Id*. at p. 211.) In the context of these facts, the Supreme Court found "California regulates rather than prohibits gambling in general and bingo in particular" and, thus, could not enforce its stricter bingo regulations on reservations. (*Id.* at pp. 211-212.)

In contrast to both *Lac Courte Oreilles* and *Cabazon*, there is no regulation of Nevada- and New Jersey-style gaming under California law generally. Rather, the general rule is a constitutional prohibition on such actions. As such, if not for Proposition 1A there would be no doubt that California prohibited rather than regulated such gaming and, thus, the Governor could exercise no executive authority in this area. (See *Artichoke Joe's California Grand Casino v. Norton* (2003) 353 F.3d 712, 721

20

[noting that post-*Cabazon* "the general criminal jurisdiction that California exercises under Public Law No. 280 allowed California to prohibit gaming for Indian tribes, if the scheme was prohibitory rather than regulatory"].) Yet, in the face of federal regulations permitting gambling on Indian lands, California has granted a limited exception to this general prohibition which permits Nevada- and New Jersey-style gaming operations on land already taken from the State to benefit Indian tribes. Such a limited exception to the general prohibition cannot be understood as a switch from prohibition to regulation given the broader constitutional ban. Indeed, on the federal side of the analysis, California's grant of limited gaming rights is generally not considered to invoke a broader grant of all gaming rights under federal law. (*Rumsey Indian Rancheria of Wintun Indians v. Wilson* (1994) 64 F.3d 1250, 1258 ["IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming . . . . In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have."] fn. omitted.) California has determined not only that the ability to authorize Nevada- and New Jersey-style casinos is a legislative function, but has constitutionalized a general prohibition to such gaming activities subject to a single regulatory exception available where the land in question is "Indian land" and thus not subject to the general California constitutional prohibition. This is not a basis for broad gubernatorial authority.

     *VII.    Remaining Issues.*

I concur and join in Justice Smith's determination the claims against certain respondents, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling Control and the State of California are not moot for the reasons he states.

I do not join in the guidance asserted in section VII of Justice Franson's opinion. I take no position on how the differing views in our opinions should affect further

proceedings upon remand.  The issues are complex and intertwined with federal law.[11]
The parties and the trial court are in the best position to work through the import of our
disposition.

    *VIII.   Conclusion.*

    In summary, I conclude the demurrers should have been overruled.  Constitutional
authority to negotiate a tribal-state compact authorizing class III gaming requires that the
land at issue be Indian land.  At the time of this tribal-state compact, the 305-acre parcel
in Madera was not Indian land.  On the facts pled by appellants, the Governor exceeded
his constitutional authority.



                  Detjen, J.

---

**11**    I do not share Justice Franson's concerns that an inability to negotiate prior to land
becoming Indian lands "might be considered a violation of IGRA's requirement for good
faith negotiations."  (Conc. & dis. opn. of Franson, J., *post*, at p. 67, fn. 29.)  Proposition
1A grants the Governor compacting authority over Indian lands.  And the federal scheme
does not mandate any negotiations until the land at issue is under tribal control (i.e., is
Indian lands).  (See 25 U.S.C.S. § 2710(d)(1)(A)(i) [making class III gaming lawful only
upon passage of ordinance by Indian tribe "having jurisdiction over such lands"]; *id*.,
(d)(3)(A) [requiring state to negotiate in good faith upon receipt of request from any
"Indian tribe having jurisdiction over the Indian lands upon which a class III gaming
activity is being conducted, or is to be conducted"]; see also *Citizens Against Casino
Gambling v. Chauduri* (2d Cir. 2015) 802 F.3d 267, 279 ["IGRA requires that any tribe
seeking to conduct gaming on land must have jurisdiction over that land."].)

FRANSON, J., Concurring and Dissenting.

I concur in all parts of the disposition in the lead opinion and agree with its resolution of some of the legal questions presented. I write separately to identify the legal issues that I have resolved differently and the points on which I agree.

This appeal addresses the controversial issue of off-reservation casinos[1] and whether the Governor of California has the authority to approve off-reservation gambling on previously nontribal lands. The specific question of California law is whether the Governor has the constitutional authority to *concur* in the Secretary s determination under IGRA that a proposed off-reservation casino "would be in the best interest of the Indian tribe and its members" and "would not be detrimental to the surrounding community," thereby allowing off-reservation gambling. (25 U.S.C. § 2719(b)(1)(A).) The answer to

---

[1]    For purposes of this opinion, I use the phrase "off-reservation casinos" to mean casinos located on "after-acquired trust land" for which the Secretary of the Interior's (Secretary) two-part determination and the Governor's concurrence is required before casino-type gambling may proceed at that location.

I use the phrase "after-acquired trust land" to refer to land acquired by the United States in trust for the benefit of an Indian tribe after October 17, 1988. That date is the effective date of the Indian Gaming Regulatory Act of 1988. (IGRA; 25 U.S.C. § 2701 et seq.; cf. 25 U.S.C. § 2719(b)(1)(A) [statute uses term "newly acquired lands"].) The phrase "after-acquired trust land" is broad and covers both "off-reservation land" and "nonconcurrence trust land."

I use the phrase "off-reservation land" to mean after-acquired trust land for which the Secretary's two-part determination and the Governor's concurrence is required before casino-type gambling may proceed at that location. Accordingly, the phrase "off-reservation casino" refers to a casino proposed or operating on off-reservation land. The terms "off-reservation land" and "off-reservation casino" are significant in this appeal because the site in question is off-reservation land and, thus, the North Fork Rancheria of Mono Indians's (North Fork) proposed casino is an off-reservation casino.

I use the phrase "nonconcurrence trust land" to refer to after-acquired trust land that is not "off-reservation land" but might become the site for a casino under provisions of federal law that do not require a Governor's concurrence. This type of land is not involved in this appeal and the term is defined for use in providing background about IGRA. (See pt. I.D.6., *post*.)

this question requires us to interpret Proposition 1A, which the voters passed in November 2000 to modify the California Constitution's prohibition of casinos.

My approach to interpreting voter initiatives that amend the California Constitution is simple. The initiative process functions best when voters are (1) informed that the initiative addresses a controversial issue with a wide range of impacts for Californians and (2) told how the initiative resolves that controversial issue. When voters are so informed, courts can "give effect to the voters' formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote." (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 930 (*RagingWire*).) Furthermore, when the voter initiative creates a specific exception to a general constitutional prohibition, the exception should not be expanded and the prohibition reduced to allow an activity on which the electorate was not asked to vote.

Using this approach to interpret Proposition 1A leads to the conclusion that it does not authorize the Governor to concur. First, the text of Proposition 1A plainly omits any power to concur in the Secretary's two-part determination and, thus, does not include a formally expressed intent to grant such a power. Second, an implied grant of that power is not "necessary" under the principles of California law that define when an implication is necessary. Third, the wording of Proposition 1A and the materials in the ballot pamphlet did not inform the average voter that approving the constitutional amendment would grant the Governor the power to concur or, more generally, would grant the Governor authority to veto or approve a proposed off-reservation casino.

In sum, expanding Indian gaming to off-reservation locations was and is a controversial issue of public policy with a wide range of consequences for Californians. It is implausible that the average voter would have understood the controversy was being resolved by an undisclosed, implied grant of the authority to concur. Simply put, there is absolutely nothing of substance in the historical record, the language or history of

2.

Proposition 1A, or the ballot materials to show that the electors were asked to vote on a grant of the authority to concur.

Therefore, plaintiffs stated a cause of action on the ground the Governor has no authority to concur in a federal two-part determination relating to an off-reservation casino. I concur in the reversal of the judgment of dismissal and the conclusion that plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. My interpretation of Proposition 1A also results in the conclusion that plaintiffs have stated a cause of action for declaratory relief stating the concurrence was void *ab initio*.

## PROCEEDINGS

The procedural history that led to the judgment of dismissal challenged in this appeal is described in the lead opinion. The main issue raised in this appeal relates to the Governor's concurrence power. The trial court decided an implied concurrence power existed and the initial briefing in this appeal addressed whether an implied concurrence power was granted by Proposition 1A. Accordingly, this opinion addresses whether an implied concurrence power exists.[2]

## DISCUSSION

I.      HISTORICAL CONTEXT FOR PROPOSITION 1A

Ascertaining the meaning of a voter initiative such as Proposition 1A requires an examination of the words and grammar of the initiative, along with the history of the initiative placed in the wider historical circumstances of its enactment. (*B.H. v. County of*

---

[2]      Under the ripeness branch of California's doctrine of justiciability, I conclude the first amended complaint and matters judicially noticed present a set of facts sufficient to frame the issue of whether the Governor was granted an implied concurrence power. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [ripeness and justiciability].) Therefore, I conclude the legal question of whether Proposition 1A granted the Governor an implied power to concur is ripe and, accordingly, it is not premature to resolve that issue of constitutional interpretation.

*San Bernardino* (2015) 62 Cal.4th 168, 190 [wider historical circumstances]; *People v. Manzo* (2012) 53 Cal.4th 880, 886 [history and background of provision]; see pt. III.B.3., *post*.)  The wider historical circumstances for the adoption of Proposition 1A in 2000 include events that defined the United States's approach to the sovereignty of tribal lands and, more recently, the regulation of Indian gaming by federal, state and tribal governments.

A.    Federal Constitution and Sovereignty

1.    *Federal Constitution*

Policies, legislation and litigation involving the possession of Indian land and the regulation of activity on that land predates the American Revolution.  (See generally Worthen & Fransworth, *Who Will Control the Future of Indian Gaming? "A Few Pages of History Are Worth a Volume of Logic"* (1996) 1996 B.Y.U. L.Rev. 407, 412–417 (*Worthen*).)  I pick up the historical trail at the Constitutional Convention, which considered the question of whether states should have the authority to enter into treaties and wars with Indians.  (*Id*. at p. 419.)  The convention did not produce a clear definition of the roles held by the federal government and the state governments in matters involving Indian tribes.  Instead, the United States Constitution provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  (U.S. Const., art. I, § 8, cl. 3.)  This provision is referred to as the Indian commerce clause.  (*Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 249 (*Agua Caliente*).)

The ambiguous power to regulate commerce with the Indian tribes could be interpreted to grant the federal government exclusive control of relations with Indians residing on Indian lands, but some objected to that interpretation based on concerns about state sovereignty and the creation of enclaves of exclusive federal control within the states.  (*Worthen*, *supra*, 1996 B.Y.U. L.Rev. at p. 419.)  Two pragmatic considerations

underlying the state sovereignty issue were (1) the denial of access to natural resources found on tribal lands within a state and (2) the creation of a haven for fugitives from state law. (*Id*. at pp. 419–420.)  The latter concern is echoed in present day measures designed to prevent organized crime from infiltrating gambling on Indian reservations.

2. *State Sovereignty Over Indian Lands*

In 1832, the ambiguity in the Indian commerce clause relating to the sovereignty of states in their dealings with Indian tribes was addressed by Chief Justice Marshall in *Worcester v. Georgia* (1832) 31 U.S. 515 (*Worcester*).  The court struck down Georgia laws that asserted jurisdiction over Cherokee lands within Georgia's borders.  (See *Worthen*, *supra*, 1996 B.Y.U. L.Rev. at p. 421.)  The court concluded the powers conferred on Congress by the United States Constitution "comprehend all that is required for the regulation of our intercourse with the Indians.  They are not limited by any restrictions on their free actions." (*Worcester*, *supra*, at p. 559.)  In short, the court determined that "the federal government and not the States had authority over the Indian Tribes." (*Worthen*, *supra*, at pp. 420–421.)

3. *Indian Sovereignty*

The nature of Indian sovereignty had been address by the United States Supreme Court the previous year in a case related to *Worcester*.  (*Cherokee Nation v. Georgia* (1831) 30 U.S. 1.)  The high court described Indian tribes as "domestic dependent nations," which provided Indian tribes with some sovereignty, but distinguished them from foreign states or independent nations.  (*Id*. at pp. 17, 19–20.)  The court stated, "they are in a state of pupilage.  Their relation to the United States resembles that of a ward to his guardian."[3] (*Id*. at p. 17.)

---

**3** This language, which makes one cringe today, suggests a policy of assimilation. Assimilation of Indians into the United States's European-based society was the federal policy pursued until the Great Depression.

5.

Indian sovereignty also was discussed in *Worcester*, *supra*, 31 U.S. 515, and that discussion, which had traced the foundation of tribal sovereignty from colonial times, was summarized recently by the California Supreme Court:

> "The court explained that since the arrival of the colonists on American soil, the tribes were treated as dependant sovereign nations, with distinct political communities under the protection and dominion of the United States. (*Worcester*, *supra*, 31 U.S. at pp. 549–561.) The tribes possessed territorial and governance rights with which no state could interfere. (*Id*. at p. 561.)" (*Agua Caliente*, *supra*, 40 Cal.4th at p. 247.)

As to the source of tribal sovereignty, the United States Supreme Court has addressed whether it was delegated to the tribes by Congress or is inherent in the tribe. (*United States v. Wheeler* (1978) 435 U.S. 313, 322.) The court stated that Indian tribes are "subject to ultimate federal control," but "remain 'a separate people, with the power of regulating their internal and social relations.'" (*Ibid*.) Thus, Indian tribes retained some inherent powers of sovereignty, while some aspects of sovereignty were divested by incorporation within the territory of the United States, other aspects were yielded by treaty, and still others were removed by Congress. (*Id*. at p. 323.) "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." (*Ibid*.)

### 4.      *Summary of Principles of Sovereignty*

Three main points about sovereignty are relevant to this appeal. First, the federal government is placed above Indian tribes in the legal hierarchy—that is, tribal sovereignty is dependent on, and subordinate to, the federal government. (*California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 207 (*Cabazon*).) Second, Indian tribes retain some, but not all, attributes of sovereignty over their members and their territory, but that sovereignty is subject to Congress's plenary control. (*Ibid*.; *United States v. Wheeler*, *supra*, 435 U.S. at p. 323.) Third, state laws apply to tribal Indians on their reservations *if and only if* Congress has expressly so provided. (*Cabazon*, *supra*, at

p. 207.)  Thus, states have no authority to regulate Indian activities on reservation land, except where Congress has granted that authority.

These points demonstrate the dominant role Congress plays (1) in Indian affairs and (2) in defining what attempts by state governments to control activities of Indian tribes are valid.  With this background, I turn to the statutes Congress has adopted to govern (1) the acquisition of new land for the benefit of Indian tribes for gaming and nongambling purposes and (2) Indian gambling in general.

B.      Indian Reorganization Act of 1934 (IRA)

1.      General Provisions

The passage of IRA marked a dramatic shift in the federal government's Indian policy, as the failure to assimilate tribal members into American society was recognized. (Worthen, *supra*, 1996 B.Y.U. L.Rev. at pp. 429–430.)  The IRA terminated allotments of land to individual Indians (which had reduced reservation land), authorized the incorporation of Indian tribes, and granted Indian tribes the right to organize by adopting constitutions and bylaws.  (25 U.S.C. §§ 5101, 5123, 5124; see *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation* (1992) 502 U.S. 251, 255 [IRA brought an abrupt end to federal policy of allotment]; Washburn, *Agency Conflict and Culture:  Federal Implementation of the Indian Gaming Regulatory Act by the National Indian Gaming Commission, the Bureau of Indian Affairs, and the Department of Justice* (2010) 42 Ariz. St. L.J. 303, 329 (*Washburn*) [IRA's purpose was to reject allotment policies and halt erosion of tribal land base].)  Although federal policy oscillated back towards assimilation in the 1950's, it returned to Indian autonomy and self-determination under President Nixon.  (See Clarkson & Murphy, *Tribal Leakage: How the Curse of Trust Land Impedes Tribal Economic Self-Sustainability* (Spring 2016) 12 J.L. Econ. & Policy 177, 187.)  Throughout that time, the IRA's provisions relating to land acquisition remained in effect.

### 2. *Acquisition of Land: The Fee-to-trust Process*

Under section 5 of the IRA, the Secretary is authorized to acquire land, "within or without existing reservations, … for the purpose of providing land for Indians." (25 U.S.C. § 5108.) One commentator described this provision of the IRA as giving the Secretary broad authority "to acquire lands for Indian tribes by virtually any voluntary means." (*Washburn*, *supra*, 42 Ariz. St. L.J. at p. 329, fn. omitted.)

Section 5 of IRA also provides: "Title to any lands or rights acquired … shall be taken in the name of the United States in trust for the Indian tribe … for which the land is acquired, and such lands or rights shall be exempt from state and local taxation." (25 U.S.C. § 5108.) Land held in trust (1) may not be sold or otherwise alienated without an act of Congress and (2) is exempt from state and local taxation. (Sheppard, *Taking Indian Land Into Trust* (1999) 44 S.D. L.Rev. 681, 682–683.) The acquisition of land and the holding of title in trust for the benefit of an Indian tribe is sometimes referred to as the fee-to-trust process. (See generally Comment, *Extreme Rubber-Stamping: The Fee-To-Trust Process of the Indian Reorganization Act of 1934* (2012) 40 Pepperdine L.Rev. 251.)

Tribes may directly acquire real estate and hold it in fee simple. (*Cass County v. Leech Lake Band of Chippewa Indians* (1998) 524 U.S. 103, 111, 115.) However, land acquired in that manner, even if former reservation land, is subject to state and local taxation. (*Id*. at p. 115)

The federal regulations governing the acquisition of land by the United States in trust for Indian tribes are contained in part 151 of title 25 of the Code of Federal Regulations. Under these regulations, "land may be acquired for a tribe in trust status" in three circumstances, including when the Secretary "determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." (25 C.F.R. § 151.3.) Land to be used for Indian gaming falls under this provision because gaming promotes self-determination and economic development. The

Secretary's decision whether to take land into trust to facilitate tribal self-determination and economic development involves the consideration of several factors, including the need of the tribe for the land, the purposes for which the land will be used, the impact on the state from removing the land from the tax rolls, potential conflicts of land use that may arise, the location of the land relative to state boundaries and the boundaries of the tribe's reservation, and, in the case where land is being acquired for business purposes, the tribe's plan specifying the anticipated economic benefits associated with the proposed use. (25 C.F.R. § 151.11, subds. (a)–(c); see 25 C.F.R. § 151.10, subds. (a)–(c) & (e)–(f)].)

IGRA, discussed below, addresses the process the Secretary undertakes to authorize class III gaming on trust lands, but contains no provision authorizing the Secretary to take land into trust. Consequently, the Secretary's statutory authority for taking land into trust derives from IRA. (*Stand Up for California! v. U.S. Dept. of the Interior* (D.D.C. Sept. 6, 2016 ___ F.Supp.3d ___, ___ [2016 U.S. Dist. Lexis 119649, p. 151].)

To summarize, IRA is the source of the federal authority for taking land into trust for Indian tribes. This authority is subject to further restrictions when a tribe's fee-to-trust application under IRA proposes to use the land *for gaming purposes*. Those additional restrictions can be found in IGRA, the federal gaming legislation discussed below. (See pt. I.D., *post*.) IGRA and IRA define some of the requirements that must be met before an Indian tribe can build a casino on after-acquired trust lands. These federal requirements delineate Congress's approach to the controversial issue of casinos on after-acquired trust lands.

C.    Developments in the 1980's

1.    *Budget Cuts*

Shortly after taking office in January 1981, President Reagan moved to abolish or reduce the funding of a variety of social programs.  (Ducheneaux, *The Indian Gaming Regulatory Act:  Background and Legislative History* (2010) 42 Ariz. St. L.J. 99, 110–111 (*Ducheneaux*).)  The cuts in federal funding of programs administered by the Bureau of Indian Affairs (BIA) and the Indian Health Service affected tribal members living on reservations.  (*Id.* at p. 111.)  Indian tribes, lacking a sound tax base or thriving economy, searched for economic development activities and, partially as the result of federal court decisions, identified gaming (particularly bingo) as a potential source of revenue.  (*Ibid.*)

2.    *Lower Court Decisions Relating to Indian Gaming*

Part of the historical context for IGRA was established by court decisions involving attempts by state or county governments to regulate bingo on Indian reservations.  The most important of these cases, *Cabazon*, *supra*, 480 U.S. 202, was decided by the United States Supreme Court in February 1987, shortly after Senator Daniel K. Inouye introduced the Indian gaming legislation that eventually became IGRA.  (Boylan, *Reflections on IGRA 20 Years After Enactment* (2010) 42 Ariz. St. L.J. 1, 4 (*Boylan*); see Pub.L. No 100-497 (Oct. 17, 1988) 102 Stat. 2467.)  The legal environment at the time of the *Cabazon* decision included the following three cases upholding the legality of on-reservation bingo.  (See Clinton, *Enactment of the Indian Gaming Regulatory Act of 1988:  The Return of the Buffalo to Indian Country or Another Federal Usurpation of Tribal Sovereignty?* (2010) 42 Ariz. St. L.J. 17, 42 (*Clinton*) [*Cabazon* "constituted the culmination of the long train of federal judicial analysis of Indian commercial gaming"].)

In *Seminole Tribe of Florida v. Butterworth* (S.D.Fla. 1980) 491 F.Supp. 1015 (*Seminole*), an Indian tribe successfully sought to permanently enjoin a county sheriff from enforcing Florida's bingo statute on the tribe's land.  (*Id.* at p. 1016.)  In *Oneida*

*Tribe of Indians v. Wisconsin* (W.D.Wisc. 1981) 518 F.Supp. 712 (*Oneida*), an Indian tribe filed a civil action and obtained declaratory relief stating that a Wisconsin statute relating to bingo operations could not be lawfully enforced on its reservation. (*Id*. at p. 713.) In *Barona Group of Capitan Grande Band of Mission Indians v. Duffy* (9th Cir. 1982) 694 F.2d 1185 (*Barona*), the Ninth Circuit of the United States Court of Appeals held that county and state laws could not be applied to bingo conducted by the tribe on its reservation in San Diego County, California. (*Id*. at p. 1190.)

These decisions employed the same method of analysis. The courts recognized that state law would apply to activities on the reservations *only if* federal law granted that authority to the states and, accordingly, addressed whether Public Law No. 83-280 (Aug. 15, 1953) (67 Stat. 588–590) did so.[4] That legislation conferred broad criminal jurisdiction and very limited civil jurisdiction. Consequently, the courts considered whether the state laws in question should be classified as criminal/prohibitory or civil/regulatory. (*Seminole*, *supra*, 491 F.Supp. at p. 1019; *Oneida*, *supra*, 518 F.Supp. at pp. 719–720; *Barona*, *supra*, 694 F.2d at p. 1188.) If the state laws were criminal/prohibitory, they would fall within Public Law No. 83-280's grant of criminal jurisdiction to the states. In contrast, if the state laws were civil/regulatory, the federal statute did not authorize their enforcement on the reservations. In all three cases, the courts determined the laws in question were regulatory because they allowed bingo to be conducted in these states under certain circumstances rather than prohibiting it outright.[5]

---

[4]     This federal statute "conferred criminal and civil jurisdiction over Indian country to certain states and authorized other states to take the necessary action to assume such jurisdiction. Six states, including California, were initially granted jurisdiction under Public Law 83-280. A few others, including Florida, assumed jurisdiction under this Act …." (*Ducheneaux*, *supra*, 42 Ariz. St. L.J. at p. 105, fns. omitted; see 18 U.S.C. § 1162 [criminal jurisdiction]; 28 U.S.C. § 1360 [civil jurisdiction].)

[5]     For example, the district court in *Seminole* concluded: "It seems plain that Florida, in permitting bingo to be run by certain groups in a restricted manner, has acknowledged certain benefits of bingo and has chosen to regulate rather than prohibit."

11.

Consequently, the courts held those state laws could not be enforced on the reservations under the criminal jurisdiction granted to states by Public Law No. 83-280. In sum, if a state allowed bingo within its borders, it could not dictate how bingo was conducted on tribal lands.

### 3. 1987 United States Supreme Court Decision

In *Cabazon*, *supra*, 480 U.S. 202, two Indian tribes filed an action seeking a declaratory judgment that Riverside County had no authority to apply its ordinances or California's statutes to bingo, draw poker and other card games conducted on their reservations. (*Id.* at pp. 205–206.) The district court granted the Indian tribes' motion for summary judgment and, in 1986, the Ninth Circuit affirmed. (*Id.* at p. 206.) The United States Supreme Court also affirmed. (*Id.* at p. 222.) Some have characterized the Supreme Court's decision as opening "the floodgates for tribal gaming." (Johnson, *Fencing the Buffalo: Off-Reservation Gaming and Possible Amendments to Section 20 of the Indian Gaming Regulatory Act* (2014) 5 UNLV Gaming L.J. 101, 106.)

In part I of *Cabazon*, the Supreme Court accepted the prohibitory/regulatory distinction as the appropriate test for determining whether Public Law No. 83-280 authorized the state to enforce its laws on an Indian reservation. (*Cabazon*, *supra*, 480 U.S. at p. 210.) The Supreme Court noted that bingo was legally sponsored by many different organizations and was widely played in California. (*Id.* at p. 211.) Based on "the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery," the court concluded "that California regulates rather than prohibits gambling in general and bingo in particular." (*Ibid.*) Consequently, the court concluded that Public Law No. 83-280 did not authorize the enforcement of California law within the reservations. (*Id.* at p. 212.)

---

(*Seminole*, *supra*, 491 F.Supp. at p. 1020.) This decision was affirmed in *Seminole Tribe of Florida v. Butterworth* (5th Cir. 1981) 658 F.2d 310.

In part II of the *Cabazon* opinion, the Supreme Court considered the state's authority to regulate the activities of non-Indians on the reservations. (*Cabazon*, *supra*, 480 U.S. at pp. 215–216.) The court broadly framed the question as "whether the state may prevent the Tribes from making available high stakes bingo games to non-Indians coming from outside the reservations." (*Id*. at p. 216.) The court then stated the specific legal issue as "whether state authority is pre-empted by the operation of federal law"—an inquiry that required the balancing of the federal and tribal interests against the state interests at stake. (*Ibid*.)

The court identified the relevant federal and tribal interests by referring to the congressional goals of Indian self-government, tribal self-sufficiency and economic development. (*Cabazon*, *supra*, 480 U.S. at p. 216.) The court described these as "important federal interests." (*Id*. at p. 217.) The court supported its description by referring to (1) the President's policy statement that self-government would be furthered by reducing tribal reliance on federal funding and (2) the actions of the Department of the Interior in promoting tribal bingo enterprises, including making grants and guaranteeing for loans for the construction of bingo facilities. (*Id*. at pp. 217–218.) As to tribal interests, the court stated the reservations contained no natural resources that could be exploited. (*Id*. at p. 218.) Furthermore, tribal games were the sole source of revenues for the operation of the tribal governments and the provision of tribal services, and were the major sources of employment on the reservations. (*Id*. at pp. 218–219.) Accordingly, tribal self-determination and economic development were closely connected to the tribal games. Against these federal and tribal interests, the sole interest asserted by California for imposing its laws on the tribes was to prevent the infiltration of organized crime into the tribal games. (*Id*. at p. 220.) The court regarded this as a legitimate concern, but it did not outweigh the federal and tribal interests supporting the tribal bingo and card club enterprises. (*Id*. at pp. 221–222.) As a result, the court concluded that the California

13.

laws were preempted by federal law and could not be applied to the tribal bingo and card games.  (*Id*. at p. 222.)

*Cabazon* (1) clarified how the existing federal statutes applied to tribal gaming and (2) described the limited authority of states to regulate gaming on Indian reservations. The court concluded that because Congress had not provided for the regulation of tribal gaming, a state could prohibit gaming on tribal lands only if the state completely prohibited all gaming within its borders.[6]  (*Cabazon*, *supra*, 480 U.S. at pp. 210–211.) *Cabazon* provided further impetus for Congress to enact tribal gaming legislation.

D.      Indian Gaming Regulatory Act of 1988

   *1.      Overview*

Congress passed IGRA in 1988 and it became effective on October 17, 1988. IGRA is the legal foundation for California's adoption of Proposition 1A.  IGRA's primary purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self–sufficiency, and strong tribal governments."  (25 U.S.C. § 2702(1).)  Additional purposes of IGRA are shielding the tribe from organized crime and other corrupting influences; ensuring the tribe is the primary beneficiary of the gaming operation; and assuring the gaming is conducted fairly and honestly by both the operator and players.  (25 U.S.C. § 2702(2).)

Once Congress decided to allow Indian gaming, it had to address what types of games to allow, who would regulate those games, and where the games could be offered. This last issue included the controversial topic of allowing casinos outside existing Indian

---

[6]      Few States have sacrificed the tax revenues and fees they receive from lottery and other gaming activities within their States in order to obtain authority under *Cabazon* and title 25 United States Code section 2710(d)(1)(B) to prohibit gambling on Indian lands. (See Note, *Casting A New Light on Tribal Casino Gaming:  Why Congress Should Curtail the Scope of High Stakes Indian Gaming* (1999) 84 Cornell L.Rev. 798, 802-803 [asserting 46 states allow gaming in a form that, under IGRA, allows high stakes Indian gaming].)

14.

lands. Congress exercised its plenary powers by (1) adopting classifications for the various types of games, (2) allocating regulatory responsibility for particular class of games among the tribes, states and federal governments, (3) generally prohibiting the expansion of casinos on lands taken into trust after the enactment of IGRA, and (4) providing specific exceptions to that general prohibition, including a procedure under which states could allow a proposed off-reservation casino by the Governor's issuance of a concurrence—the very act that is challenged in this litigation.

As to the allocation of regulatory responsibility for high stakes casino-type gambling conducted on Indian land, Congress employed the concept of tribal-state gaming compacts under which the tribes and states would share responsibility. As to the expansion of Indian gaming to off-reservation locations, Congress created a separate and distinct mechanism that required the approval of the Indian tribe, the federal government and the state. Specifically, the mechanism allowed Indian gaming on an off-reservation site only if the Secretary decided to take the new land into trust for gaming purposes and the state's governor concurred in the Secretary's decision. As shown below, the mechanism for authorizing off-reservation Indian gaming is separate and distinct from tribal-state compacts. Compacts allow Indian tribes to negotiate with states to determine the scope and regulations of gambling on Indian lands, if gaming is allowed in the state. Concurrences, on the other hand, are necessary for the proposed off-reservation casino to qualify for a specific exception to the general rule prohibiting casinos on after-acquired trust lands. Under this particular exception, a state's Governor can give a thumbs-up to an off-reservation casino by issuing a concurrence or, alternatively, can veto the proposed casino by withholding his or her concurrence.

2.    *Development and Enactment of IGRA*

IGRA "is the outgrowth of several years of discussions and negotiations between gaming tribes, states, the gaming industry, the administration, and the Congress, in an

15.

attempt to formulate a system for regulating gaming on Indian lands." (Sen.Rep. No. 100-446, 2d Sess., p. 1 (1988) (Sen.Rep. 100-446).) Professor Santoni provides an overview of the bills introduced from 1983 to 1988 that formed the legislative journey leading to the emergence of IGRA. (Santoni, *The Indian Gaming Regulatory Act: How Did We Get Here? Where Are We Going?* (1993) 26 Creighton L.Rev. 387, 395 (*Santoni*).) That overview and the many issues and compromises reached will not be repeated here.

Instead, this appeal is concerned with the issues and compromises that were addressed through the tribal-state compacts and the concurrence authority. Those matters include (1) the types of gaming allowed, (2) who regulates, or shares regulatory control over, the various types of gaming, and (3) where the gaming may be conducted. The concept of tribal-state compacts was used by IGRA to deal with the first two issues. IGRA adopted the state Governor's concurrence solely as a condition to the final approval of casino-style gaming on off-reservation lands.

### 3. IGRA's Three Classes of Gaming

IGRA divided games into three classes and identified who was responsible for regulating each class. Class I games are "social games solely for prizes of minimal value or traditional forms of Indian gaming" connected with "tribal ceremonies or celebrations." (25 U.S.C. § 2703(6).) "Class I gaming on Indian land is within the exclusive jurisdiction of Indian tribes and shall not be subject to the provisions of [IGRA]." (25 U.S.C. § 2710(a)(1).) Thus, Indian tribes have complete control over class I gaming and the federal and state government have no role in regulating those games.

Class II gaming consists of bingo, games similar to bingo, and certain card games. (25 U.S.C. § 2703(7).) IGRA created "a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands …." (Sen.Rep. 100-446, *supra*, p. 1.) IGRA established the National Indian Gaming Commission (NIGC) as an

independent agency within the Department of the Interior and assigned it a regulatory role for class II gaming. (Sen.Rep. 100-446, *supra*, p. 1.) Generally, a tribe may engage in, or license and regulate, class II gaming on Indian land if (1) the state where the gaming is located permits such gaming for any purpose by any person or entity, (2) the tribe has adopted an ordinance or resolution regulating the class II gaming, and (3) the NIGC has approved the ordinance or regulation. (25 U.S.C. § 2710(b)(1).)

Class III gaming—the type involved in this litigation—covers all other forms of gaming, such as "slot machines, casino games including banking card games, horse and dog racing, pari-mutuel, jai-alai, and so forth." (Sen.Rep. 100-446, *supra*, p. 3; § § 2703(8); *Keweenaw Bay Indian Community v. United States* (6th Cir. 1998) 136 F.3d 469, 473 (*Keweenaw Bay*) [class III includes "'high-stakes casino-style' gaming"].) The Select Committee on Indian Affairs, balancing the federal interest of preserving tribal sovereignty and the need for sound enforcement of gaming laws and regulations, developed a framework for the regulation of class III gaming on Indians lands that did not unilaterally impose state jurisdiction on Indian lands for the regulation of class III gaming activities, but instead allowed tribes to elect to have state laws and state jurisdiction extend to tribal lands. (Sen.Rep. 100-446, *supra*, pp. 5–6.)[7] Without this election by the tribe, class III gaming activities could not be conducted on its lands.

### 4. Tribal-state Compacts

The tribal election is exercised by requesting a tribal-state compact—"[t]he mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of state jurisdiction and the application of state laws to [class III gaming] conducted on Indian land …." (Sen.Rep. 100-446, *supra*, p. 6.) IGRA "does

---

[7] Some tribes opposed any federal or state regulation of gaming on tribal lands, preferring exclusive tribal regulation. (*Clinton*, *supra*, 42 Ariz. St. L.J. at pp. 58–59.) Others were willing to accept some outside regulation, provided it was done by the federal government. (*Id*. at p. 59.)

17.

not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absen[c]e of a tribal-State compact." (Sen.Rep. 100-446, p. 6.) Thus, in the view of the Select Committee on Indian Affairs, "the compact process is a viable mechanism for setting various matters between two equal sovereigns" that both have significant governmental interests in the conduct of class III gaming. (*Id*. at p. 13.)

The idea of the compact mechanism appears to have been derived from a recommendation by the National Indian Gaming Task Force to Congress that suggested "off-reservation gaming regulated by recognized Indian governments should be dealt with on the local and State level by means of agreements between the parties. Such agreements would provide protection as well as define their respective obligations." (Indian Gambling Control Act, Part I: Hearing on H.R. No. 1920 and H.R. No. 2404 before the House Com. on Interior and Insular Affairs, 99th Cong., 1st Sess., p. 173 (1985); see *Clinton*, *supra*, 42 Ariz. St. L.J. at pp. 58–60.) The proposed agreement, "although expressly limited to 'off-reservation gaming,' may have been the first suggestion of the compact mechanism that ultimately became the compromise measure Congress adopted late in its legislative discussions to break the stalemate between opposing views on the question of class III gaming" and its regulation. (*Clinton*, *supra*, at pp. 59–60.) Accordingly, the revised version of Senate Bill 555 that became IGRA "introduced the Tribal-State compact concept" as a compromise to resolve the disputes concerning appropriate jurisdiction over class III. (*Santoni*, *supra*, 26 Creighton L.Rev. at p. 403.)

IGRA provides that in states allowing class III "gaming for any purpose by any person, organization, or entity," an Indian tribe and the state may enter a compact for the conduct of class III gaming on the Indian lands under the tribe's jurisdiction. (25 U.S.C. § 2710(d)(1) & (d)(3).) To complete such a compact, tribes and states must negotiate a range of issues that relate to the scope of the games, standards for operating the games, regulatory responsibility, allocation of criminal and civil jurisdiction, liquor sales, and

taxes on retail and restaurant outlets. (25 U.S.C. § 2710(d)(3)(C); *Boylan*, *supra*, 42 Ariz. St. L.J. at p. 8.) From the perspective of sovereignty, the tribal-state compact grants the state control over activities on Indian land that it would not have without the compact. In that sense, tribal-state compacts expand the state's jurisdiction.

One reason Congress chose a mechanism that involved the states (as opposed to a federal agency) in regulating class III gaming was "that the expertise to regulate gaming activities and to enforce laws related to gaming could be found in state agencies, and thus that there was no need to duplicate those mechanisms on a Federal level." (Sen.Rep. 100-446, *supra*, p. 5.) The tribal-state compact mechanism would tap into this expertise and "assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises .…" (*Id*. at p. 13.)

An issue not resolved by IGRA was which state official has the responsibility of negotiating the tribal-state compact. (*Santee Sioux Tribe of Nebraska v. State of Nebraska* (8th Cir. 1997) 121 F.3d 427, 431; see 25 U.S.C. § 2710(d)(3).) As a result of IGRA's silence on this point, each state must decide that question for itself.[8]

The fact that tribes cannot conduct class III gaming on their lands without a gaming compact appears to give the states a great deal of power in negotiating the terms of the compact. This imbalance in power created the concern that the compact requirement for class III gaming might "be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes." (Sen.Rep. 100-446, *supra*, p. 13.) Consequently, IGRA restricted the authority of states by requiring them to

---

[8]     For example, in *State ex rel. Stephan v. Finney* (1992) 251 Kan. 559, the Kansas Supreme Court determined the Kansas Governor could negotiate tribal-state compacts, but had no power to bind the state to the compact because that power was held exclusively by the Legislature. (*Id*. at p. 583; *State ex rel. Clark v. Johnson* (1995) 120 N.M. 562, 578 [Governor of New Mexico lacked constitutional or statutory authority to enter into tribal-state gaming compacts].)

19.

"negotiate with the Indian tribe in good faith." (25 U.S.C. § 2710(d)(3)(A); see Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act* (1997) 29 Ariz. St. L.J. 25, 54–55 [statutory process for tribal-state compacts under IGRA].) To enforce this duty to negotiate, IGRA granted federal district courts jurisdiction over causes of action brought by tribes alleging the state failed to negotiate in good faith. (25 U.S.C. § 2710(d)(7)(A).) If the district court finds a lack of good faith, it may direct the parties to conclude a compact and, if that attempt is unsuccessful, select a mediator who will choose the proposed compact that best comports with IGRA. (25 U.S.C. § 2710(d)(7)(B)(iv); see *Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 73–74 [state's duty to negotiate enforceable through by "the carefully crafted and intricate remedial scheme set forth in § 2710(d)(7)"].)

IGRA's requirement that a state negotiate a tribal-state compact in good faith, and the remedies provided for the failure to negotiate in good faith, means that state control over the tribal-state compact is limited. [9] A state that allows class III gaming within its borders cannot prevent an Indian tribe from conducting class III gaming on its lands by refusing to enter into a compact. In short, states are not given veto power over compacts, like they are with concurrences.

### 5. General Prohibition of Gaming on After-acquired Trust Land

IGRA authorizes gaming only on "Indian lands." (25 U.S.C. § 2702(3); see *Washburn*, *supra*, 42 Ariz. St. L.J. at p. 330.) IGRA defines "'Indian lands'" as (1) "all lands within the limits of any Indian reservation"; (2) any lands "held in trust by the

---

[9] Potentially, when a federal court finds the state has not negotiated in good faith, the state essentially loses its power to participate in the compact process, which is what eventually occurred with this proposed project. (See *North Fork Rancheria of Mono Indians v. California* (E.D.Cal., Nov. 13, 2015, No. 1:15-CV-00419) 2015 U.S. Dist. Lexis 154729.) The foregoing lawsuit involved the Madera site and generated two decisions cited in this opinion. I refer to the lawsuit as *Good Faith Compact Case*, the November 2015 decision as *Good Faith Compact Case I* and the August 2016 decision as *Good Faith Compact Case II*.

United States for the benefit of any Indian tribe or individual"; and (3) any lands held in fee by any tribe or individual subject to a federal restriction on alienation. (25 U.S.C. § 2703(4).)

The inclusion of trust lands in this definition created a concern that, after enactment, tribal governments might acquire trust land in or near metropolitan areas and open bingo or casino facilities on that land. (*Boylan*, *supra*, 42 Ariz. St. L.J. at pp. 9–10.) IGRA addressed this concern by adding a separate provision, section 20, to address gaming on lands acquired in trust after October 17, 1988, the date of IGRA's enactment. (25 U.S.C. § 2719; *Boylan*, *supra*, at p 10.) Section 20 of IGRA prohibits gaming on after-acquired trust lands, unless a statutory exception applies. (25 U.S.C. § 2719(a).) Section 20 of IGRA has been referred to as an anti-proliferation provision. (*Clinton*, *supra*, 42 Ariz. St. L.J. at p. 58.)

6. *Exceptions to Prohibition of Gaming on After-acquired Trust Land*

The general prohibition of class III gaming on after-acquired trust land created concerns about unfair or dissimilar treatment of tribes without a land base and tribes not yet recognized by the federal government. (*Boylan*, *supra*, 42 Ariz. St. L.J. at p 10.) To address these concerns, Congress created exceptions for (1) new and restored reservations and (2) acquisitions of land within an existing reservation and land outside an existing reservation. (*Ibid.*; see 25 U.S.C. § 2719(b).)

The various exceptions are addressed in part 292 of title 25 of the Code of Federal Regulations (Part 292), which is labeled "Gaming on Trust Lands Acquired After October 17, 1988." (73 Fed.Reg. 29354, 29375 (May 20, 2008).) Part 292 contains the procedures used by the Department of the Interior to determine whether an exception applies. (See 25 C.F.R. § 292.1.)

The exception relevant to this appeal requires the Governor's concurrence and is described in the next subpart. The other statutory exceptions for after-acquired trust land

21.

that potentially could be applied in California involve (1) lands located within or contiguous to the boundaries of the tribe's reservation on October 17, 1988 (25 U.S.C. § 2719(a)(1)); (2) lands acquired for a tribe whose last recognized reservation was within California and, as of October 17, 1988, the tribe had no reservation (25 U.S.C. § 2719(a)(2)(B); and (3) land "taken into trust as part of—[¶] (i) a settlement of a land claim, [¶] (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgement process, or [¶] (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition" (25 U.S.C. § 2719(b)(1)(B)). As previously noted, I refer to these types of after-acquired trust lands as "nonconcurrence trust lands."

None of these exceptions involve the concurrence by the Governor in any federal decision allowing an Indian tribe to conduct class III gaming on lands so taken into trust. Consequently, once a state has decided to allow class III gaming "for any purpose by any person, organization, or entity" (25 U.S.C. § 2710(d)(1)(B)), the state cannot block or otherwise prohibit class III gaming on nonconcurrence trust lands. The requirement for a tribal-state compact allows the state some input as to the gaming operations, but states do not have the ability to prevent class III gaming by refusing to enter into a tribal-state compact because IGRA specifically requires the state to negotiate a compact with the Indian tribe in good faith. (See pt. I.D.4., *ante*.) If the state fails to do so, secretarial procedures that take the place of a compact can be forced on the state under IGRA's provisions that allow a federally appointed mediator to choose between the proposed compacts, if any, and then notify the Secretary of the choice. (See 25 U.S.C. § 2710(d)(7)(B)(iv)–(vii).) The Secretary shall prescribe, in consultation with the Indian tribe, procedures for the conduct the class III gaming that are consistent with the proposed compact selected by the mediator. (25 U.S.C. § 2710(d)(7)(B)(vii).)

To summarize, there are narrowly drafted exceptions in section 20 of IGRA that have the potential to result in casinos being operated by Indian tribes on after-acquired

22.

trust lands in California that do not involve or require the Governor's concurrence. (25 U.S.C. § 2719(b).) In contrast, only one of the exceptions requires a state's Governor's concurrence as a necessary condition to conduct class III gaming on after-acquired trust land. That issue is the focus of this appeal.

### 7. *Exception Involving Governor's Concurrence*

The exception relevant to this appeal has four main elements: (1) a tribal application submitted to the Secretary, (2) a consultation requirement imposed on the Secretary, (3) a two-part determination by the Secretary, and (4) the Governor's concurrence in the Secretary's determination. (25 U.S.C. § 2719(b)(1)(A).)[10] The exception "has become known as the 'two-part determination' exception to the prohibition on gaming on after-acquired lands." (*Boylan*, *supra*, 42 Ariz. St. L.J. at p. 10, fn. omitted; see *Picayune Rancheria of Chukchansi Indians v. Brown* (2014) 229 Cal.App.4th 1416, 1421.) To reiterate, it is the only exception that involves any kind of a concurrence from a state's Governor.

When after-acquired trust lands do not qualify for any of the other exceptions under section 20 of IGRA, a tribe may submit a written application to the Secretary requesting the Secretary to make the two-part determination. (25 C.F.R. § 292.13; see 73 Fed.Reg. 29354 (May 20, 2008) as corrected in 73 Fed.Reg. 35579 (June 24, 2008).) The Secretary's two-part determination is made "after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes." (25 U.S.C. § 2719(b)(1)(A).) The procedures for conducting the consultation process require a letter be sent to the appropriate officials soliciting comments and an opportunity for the applicant tribe to respond to those comments. (25 C.F.R. §§ 292.19 [letter and comment period], 292.20 [contents of consultation letter].)

---

**10**  The federal regulations addressing the exception and its four elements are set forth in subpart C of Part 292. (See 25 C.F.R. §§ 292.13–292.25.)

After reviewing the tribe's written application and completing the consultation process, the Secretary is in a position to decide both elements of the two-part determination—specifically, whether gaming on the land (1) "would be in the best interest of the Indian tribe and its members" and (2) "would not be detrimental to the surrounding community." (25 U.S.C. § 2719(b)(1)(A).) If the Secretary determines an element is not met, the tribe must be informed of both the disapproval of application and the reasons. (25 C.F.R. § 292.21(b).) Alternatively, if the Secretary makes a favorable two-part determination, the Secretary will send the Governor of the state written notification of its determination and findings of fact, a copy of the entire record, and a request for the Governor's concurrence in the determination. (25 C.F.R. §§ 292.21(c), 292.22.)

The two-part determination exception was tailored to take into consideration federal, tribal, state and local interests affected by a proposed off-reservation casino. The evaluation of these interests requires the Secretary and the Governor to make political judgments. The concurrence requirement gives the Governor, for practical purposes, veto or approval authority over off-reservation gaming.[11] (*Boylan*, *supra*, 42 Ariz. St. L.J. at p. 11.) The concurrence requirement, in contrast to the compacting mechanism, is not subject to a good faith requirement and, thus, gives the state the absolute power to prohibit the expansion of class III gaming to off-reservation sites. A rationale for

---

**11**     The concurrence condition can be traced to a House of Representative's bill proposed in the 99th Congress (1985-1986) that would have required the Secretary consult with a state's Governor to ascertain the state's public policy on gaming. (*Clinton*, *supra*, 42 Ariz. St. L.J. at p. 57.) This gubernatorial consultation requirement related to gaming on *existing* Indian land and was not adopted. However, a similar device—the governor's concurrence—subsequently became part of the anti-proliferation provisions in section 20 of IGRA addressing gaming on after-acquired trust land. (*Clinton*, *supra*, at pp. 57-58; 25 U.S.C. § 2719(b)(1)(A).) The legislative history of the provisions requiring input from a governor (including the provision requiring concurrence) shows that the concurrence condition developed apart from the compacting mechanism and, thus, is not an integral or essential piece of the compacting authority.

24.

granting a state this veto authority is that the state loses jurisdiction over the land taken into trust and such a loss should not occur without the state's approval.

The two-part determination exception had been used only a few times to authorize off-reservation casinos when Proposition 1A was presented to the voters in 2000. For nearly 18 years after IGRA was enacted, there had been only three instances, all outside of California, where a governor had concurred in a two-part determination. (Off-Reservation Gaming: Land into Trust and the Two-Part Determination, Hearing before the Sen. Com. on Indian Affairs, 109th Cong., 2d Sess., p. 4 (2006), testimony of George Skibine, Acting Deputy Assistant Secretary, Policy and Economic Development for Indian Affairs, Department of the Interior.) As a result of these concurrences, off-reservation land in Wisconsin, Washington and Michigan was acquired in trust for purposes of Indian gaming.[12] Thus, in 2000 when California's voters approved Proposition 1A, the exception involving a governor's concurrence authority for off-reservation gaming had been rarely used.

### 8. *Intertwined Approvals Under IRA and IGRA*

The construction and operation of a casino on land, like the site in this case, that was not held in trust for the tribe when the casino was proposed, cannot occur until (1) the land is taken into trust for the benefit of the tribe pursuant to IRA and (2) the requisite approvals of Indian gaming are obtained under IGRA. The fact that two federal statutes are involved raises questions about how the sequence in which the various approvals are

---

[12] The three tribes were the Forest County Pottawatomi Tribe in Wisconsin (1990); the Kalispel Tribe in Washington (1997); and the Keweenaw Bay Indian Community in Michigan (2000). (*Boylan*, *supra*, 42 Ariz. St. L.J. at p. 11, fn. 50.) *Boylan* also referred to the 2008 tribal-state compact that Governor Schwarzenegger negotiated with the Fort Mojave Indian Tribe, but that compact was not ratified by the Legislature and the Secretary did not publish a notice of approval in the Federal Register. (Cf. Gov. Code, § 12012.45, subd. (a)(2) [Aug. 23, 2004, compact between California and the Fort Mojave Indian Tribe ratified]; 69 Fed.Reg. 76004 (Dec. 20, 2004) [notice of approval of compact between California and Fort Mojave Indian Tribe].)

obtained. A federal district court described the sequence in a federal lawsuit involving North Fork's applications relating to its casino proposal:

> "[T]he Secretary's [two-part] decision under the IGRA must logically be finalized *before* the Secretary's [land-to-trust] decision under the IRA can be made. Permitting gaming on trust land would be essential to the Secretary's conclusion under the IRA that the acquisition meets the criteria listed in 25 C.F.R. Part 151, such as '[t]he need of the individual Indian or the tribe for additional land,' and '[t]he purposes for which the land will be used.' *See* 25 C.F.R. § 151.10. Similarly, the governor's concurrence is plainly required before gaming on trust land can be permitted. *See* 25 U.S.C. § 2719(b)(1)(A). Therefore, in this case, approving a trust acquisition under the IRA prior to the governor's concurrence would have been putting the proverbial cart before the horse: The Secretary would not yet have known whether gaming would be permitted and thus would have had no basis to ascertain whether the basic criteria for approving a trust acquisition had been met." (*Stand Up for California v. U.S. Dept. of the Interior* (D.D.C. 2013) 919 F.Supp.2d 51, 71.)

As to the relative timing of a fee-to-trust application under IRA and an application for a two-part determination for a proposed casino under IGRA, a tribe may submit its applications at the same time. (25 C.F.R. § 292.15.) The history of the applications relating to the casino site proposed by North Fork is set forth in part II, *post*.

E. California's Proposition 5

Prior to the adoption of IGRA, the California Constitution set forth a fundamental public policy against the legalization in California of casino gambling. "The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e).)

After IGRA was enacted, several conflicts developed between the State of California and Indian tribes over class III gaming, particularly stand-alone gaming devices and live banking and percentage card games. (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 596–597 (*Davis*).) To resolve these conflicts relating to class III gaming on Indian lands, Proposition 5 was drafted and

26.

presented to California's voters as an initiative statute, not a constitutional amendment. (*Davis*, *supra*, at pp. 597–598.)

In 1998, California's voters approved Proposition 5. (*Davis*, *supra*, 21 Cal.4th at p. 589.) Proposition 5 purported to authorize the state to enter into tribal-state compacts as contemplated by IGRA, but because the measure was only statutory, it was held to be invalid in light of the constitutional gambling prohibition. (*Davis*, *supra*, at pp. 589–590.)

F.      1999 Compacts and Assembly Bill No. 1385

Less than a month after the California Supreme Court invalidated Proposition 5, the State of California executed 57 tribal-state gaming compacts entered into pursuant to IGRA.[13] The compacts allowed, on reservation land that was not subject to the two-part determination and the Governor's concurrence, the tribes to present a wider range of games than previously offered, including full Las Vegas-style slot machines, and provided tribes with the exclusive right to conduct class III gaming within California. (Koenig, *Gambling on Proposition 1A: The California Indian Self-Reliance Amendment* (2002) 36 U.S.F. L.Rev. 1033, 1043–1044.) In exchange, the tribes agreed to (1) contribute to a special distribution fund to offset expenses incurred by the state in connection with tribal gaming and (2) revenue sharing that allocates funds to nongaming tribes. (*Id*. at pp. 1047–1049 [revenue sharing] & 1051 [special distribution fund]; see Gov. Code, §§ 12012.75 [revenue sharing trust fund], 12012.85 [special distribution fund].)

---

[13]      The tribal-state compacts are identified in paragraphs (1) through (57) of subdivision (a) of section 12012.25 of the Government Code. None of these compacts required a Governor's concurrence. (See generally Note, *Chapter 51: Approval of Tribal-State Gaming Agreements Governing California's First Off-Reservation Casino* (2014) 45 McGeorge L.Rev. 521 (*California's First Off-Reservation Casino*).)

On September 10, 1999—the same day the compacts were executed—both the Assembly and the Senate ratified the compacts by unanimously approving Assembly Bill No. 1385 (1999-2000 Reg. Sess.) (AB 1385). This legislation is codified in sections 12012.25, 12012.75 and 12012.85 of the Government Code.[14] (See Stats. 1999, ch. 874, §§ 1–3.) For purposes of this appeal, I note that AB 1385 does not mention (1) off-reservation casinos or (2) the Governor concurring in the Secretary's two-part determination related to taking off-reservation land into trust for gaming purposes. Furthermore, none of the 57 compacts ratified by AB 1385 involved the two-part determination exception to IGRA's general prohibition against gaming on after-acquired trust land and, therefore, did not require a Governor's concurrence. (See generally *California's First Off-Reservation Casino*, *supra*, 45 McGeorge L.Rev. 521.)

The 1999 compacts were conditioned upon the subsequent passage of Proposition 1A. (*California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1412.) That proposition was drafted to amend the California Constitution and remove the grounds used to invalidate Proposition 5. (*Ibid.*)

G.     Proposition 1A

    1.     *Ballot Materials*

In 2000, the initiative designated as Proposition 1A—"Gambling on Tribal Lands. Legislative Constitutional Amendment"—was presented to California's voters. The

---

**14**     The legislative history for Government Code section 12012.25 provides no guidance as to the voters' understanding of the later adopted constitutional provision because none of the indicia of the Legislature's intent was before the voters. (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 124, p. 231, citing *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 801.) But even if the voters were aware of the materials in that legislative history, they would not have understood Proposition 1A as granting the concurrence authority because the materials do not mention concurrence or off-reservation casinos. (See e.g., Legis. Counsel's Dig., Assem. Bill No. 1385 (1999-2000 Reg. Sess.)

28.

Attorney General's summary of Proposition 1A that appeared in the ballot pamphlet stated:

> "Modifies state Constitution's prohibition against casinos and lotteries, to authorize Governor to negotiate compacts, subject to legislative ratification, for the operation of slot machines, lottery games, and banking and percentage card games by federally recognized Indian tribes on Indian lands in California, in accordance with federal law.
>
> "Authorizes slot machines, lottery games, and banking and percentage card games to be conducted on tribal lands subject to the compacts." (Voter Information Guide, Primary Elec. (Mar. 7, 2000) official title and summary of Prop. 1A, p. 4 (Voter Information Guide).)

The Legislative Analyst's analysis of Proposition 1A, printed in the ballot pamphlet provided background on gambling in California, gambling on Indian land under IGRA, and gambling on Indian lands in California. (Voter Information Guide, *supra*, analysis of Prop. 1A by Legis. Analyst, p. 4.) The background information stated that California had over 100 Indian rancherias/reservations and about 40 Indian gambling operations, which offered a variety of gambling activities. (*Ibid*.) The analysis (1) described the virtually identical compacts with 57 tribes that, in 1999, had been negotiated by the Governor and ratified by the Legislature and (2) stated that the compacts would become effective only if Proposition 1A was approved and the federal government approves the compacts. (*Id*. at pp. 4–5.) The analysis described the proposal by stating:

> "This proposition amends the State Constitution to permit Indian tribes to conduct and operate slot machines, lottery games, and banked and percentage card games on Indian land. These gambling activities could only occur if (1) the Governor and an Indian tribe reach agreement on a compact, (2) the Legislature approves the compact, and (3) the federal government approves the compact. (Although this proposition authorizes lottery games, Indian tribes can currently operate lottery games—subject to a gambling compact. This is because the State Constitution permits the State Lottery, and Indian tribes can operate any games already permitted in the state.)" (*Id*. at p. 5.)

29.

The authorization of slot machines was a controversial part of Proposition 1A. The analysis addressed slot machines by stating that (1) the compacts would allow each tribe at least 350 slot machines and (2) tribes may pay for licenses for additional machines, but generally may not operate more than 2,000 machines. (Voter Information Guide, *supra*, analysis of Prop. 1A by Legis, Analyst, fig. 1, p. 5.)

Although the analysis stated that California had "over 100 Indian rancheria/reservations" it did not mention off-reservation or after-acquired lands. (Voter Information Guide, *supra*, analysis of Prop. 1A by Legis. Analyst, p. 4.) It also provided no explanation of what was meant by its references to "tribal lands" and "Indian lands" and did not mention gambling outside existing reservations. The analysis also referred to the 57 tribal-state compacts and the process of entering such compacts. (*Id.* at p. 5.) It made no mention of a Governor's concurrence, a two-part determination by the Secretary, or casinos proposed for off-reservation lands.

### 2. *Arguments in Ballot Pamphlet*

The arguments and rebuttals set forth in the ballot pamphlet addressed issues raised by the 57 tribal-state compacts and did not state directly whether Proposition 1A granted the Governor concurrence authority. On the topic of Indian gaming outside existing reservations, the proponents and opponents of Proposition 1A took different positions.

The proponents stated that they were seeking passage "so we can keep the gaming we have on our reservations." (Voter Information Guide, *supra*, argument in favor of Prop. 1A, p. 6.) This argument implies that Proposition 1A did not address off-reservation casinos—an implication reinforced by the fact that none of the compacts proposed at that time required the Secretary's two-part determination and the Governor's concurrence. The proponents also asserted: "If Proposition 1A fails, tribal gaming

30.

would face being shut down. This would be devastating for California Indian Tribes—and bad for California's taxpayers." (*Ibid*.)

Opponents argued that "Proposition 1A and the Governor's compact with gambling tribes will trigger a massive explosion of gambling in California." (Voter Information Guide, *supra*, argument against Prop. 1A, p. 7.) One aspect of the predicted explosion related to location, as the opponents warned: "Casinos won't be limited to remote locations. Indian tribes are already buying up prime property for casinos in our towns and cities." (*Ibid*.) This argument implies that Proposition 1A would allow casinos on after-acquired trust lands, which contradicts the position implied by the proponents.

The proponents rebutted the arguments against Proposition 1A by quoting a former field investigator of the NIGC, who asserted: "'Proposition 1A and federal law strictly limit Indian gaming to tribal land. The claim that casinos could be built anywhere is totally false.'" (Voter Information Guide, *supra*, rebuttal to argument against Prop. 1A, p. 7.) The rebuttal also quoted an economist who stated: "'The majority of Indian Tribes are located on remote reservations and the fact is their markets will only support a limited number of machines.'" (*Ibid*.)

These passages show the proponents and opponents disagreed as to how Proposition 1A would be interpreted and applied to casinos outside existing reservations. Opponents wanted voters reading the pamphlet to believe gambling would spread outside existing reservations, while proponents wanted voters to believe gambling would be confined to existing reservations. The conflicting positions presented in the ballot pamphlet demonstrate that voters were not presented with a single interpretation of how Proposition 1A would be applied to off-reservation casinos.

### 3. Text of Constitutional Amendment

In November 2000, the voters approved Proposition 1A and amended section 19 of article IV of the California Constitution to include the following:

> "(f) Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts." (Cal. Const., art. IV, § 19, subd. (f); Historical Notes, 1E West's Ann. Cal. Const. (2012 ed.) foll. art. IV, § 19, p. 604.)

The meaning of this text is analyzed in part IV, *post*.

## II. HISTORY OF THE MADERA SITE

The proposal by North Fork for a casino in Madera County requires a variety of approvals and actions at the local, state and federal level. This part of the opinion sets forth a history of the various approvals and action relating to the Madera site and the proposed casino. Also, it describes some of the state[15] and federal lawsuits generated by the proposal, both in California and Washington, D.C.

### A. 2004: Initial Plans and Federal Environmental Review

In 2004, North Fork began taking the steps necessary to implement its plan to build a gaming facility on land in Madera County. (*Good Faith Compact Case I*, *supra*, 2015 U.S. Dist. Lexis 154729 at p. 4.) The land is a 305-acre parcel located in an unincorporated portion of the county adjacent to State Route 99 just outside the northwest border of the City of Madera (Madera site). (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, 919 F.Supp.2d at p. 54.) The proposed casino-resort complex includes a

---

[15] See *Picayune Rancheria of Chukchansi Indians v. Brown*, *supra*, 229 Cal.App.4th at page 1420 (Governor was not subject to California's environmental statute when he concurred in federal determination relating to North Fork's gaming proposal for the Madera site).

gaming floor offering up to 2,500 gaming devices, six bars, three restaurants, a five-tenant food court, a 200-room hotel tower, and 4,500 parking spaces. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d ___, ___ [2016 U.S. Dist. Lexis 119649, p. 5].)

In July 2004, soon after starting the process of acquiring the property,[16] North Fork entered into discussions with representatives of then-Governor Arnold Schwarzenegger for a tribal-state gaming compact. (*Good Faith Compact Case I*, *supra*, 2015 U.S. Dist. Lexis 154729, pp. 5–6.) Later in 2004, BIA published a notice of intent to prepare an environmental impact statement (EIS) for North Fork's proposed trust acquisition of the Madera site and the development of a casino-resort on that site. (69 Fed.Reg. 62721 (Oct. 27, 2004).) The notice provided the public an opportunity to comment on the scope and implementation of the proposal. Later, the comment period was extended to May 6, 2005. (70 Fed.Reg. 17461 (Apr. 6, 2005).) The federal environmental review process is mentioned here because that process took a long time and affected the timing of the other steps taken by North Fork.[17] (See 75 Fed.Reg. 47621 (Aug. 6, 2010) [final EIS released for public comment].)

---

[16] Before the Madera site was transferred into trust for the benefit of the tribe in February 2013, it was owned by North Fork's development partner, SC Madera Development, LLC. That company is a subsidiary of Nevada-based Station Casinos. (*California's First Off-Reservation Casino*, *supra*, 45 McGeorge L.Rev. at pp. 528–529.) Critics of the proposal describe it as an example of ""'"reservation shopping"'"" that places a casino in a prime location. (*Id*. at p. 529, fn. 79; see Fletcher, *Bringing Balance to Indian Gaming* (2007) 44 Harv. J. on Legis. 39, 67 ["'reservation shopping'" is "a political code word" that links off-reservation Indian gaming expansion to non-Indian gaming developers].) North Fork and Station Casinos have signed a casino management contract that gives Station Casinos the right to operate the casino and receive 24 percent of its net income.

[17] For example, a tribal-state gaming compact was executed by Governor Schwarzenegger in April 2008, but was never presented to the Legislature for ratification because of delays resulting from the lengthy federal environmental review process. (*Good Faith Compact Case I*, *supra*, 2015 U.S. Dist. Lexis 154729, p. 6.)

B.      Fee-to-trust Application Under IRA

In March 2005, North Fork submitted a formal fee-to-trust application to the Secretary requesting the Department of the Interior to accept trust title to the Madera site. The application was filed under section 5 of IRA (25 U.S.C. § 5108) and its implementing regulations (25 C.F.R. § 151.)  The factors to be considered included any proposed business use and the anticipated economic benefits from that use.  (See 25 C.F.R. § 151.11, subd. (c); see generally 25 C.F.R. § 151.11 [off-reservation acquisitions].)

As to timing, North Fork's formal fee-to-trust application was submitted to the Secretary after North Fork began discussing a tribal-state gaming compact for the site with the Governor and after the federal environmental review process started.  The Secretary's decision on the fee-to-trust application could not be made until after the environmental consequences of the proposed casino-resort project had been analyzed in a final EIS.

C.      Two-Part Determination Under IGRA

The appellate record does not show when North Fork applied to the Secretary for the two-part determination that was essential to qualifying for an exception to IGRA's prohibition of class III gaming on after-acquired trust land.  (See 25 U.S.C. § 2719(a) [general prohibition].)  That application might have been submitted at the same time as the fee-to-trust application.  (See 25 C.F.R. § 292.15 [application for two-part determination for land not yet held in trust may be submitted at the same time as the fee-to-trust application].)

In September 2011, an assistant secretary for Indian affairs issued an IGRA record of decision that addressed the two-part determination contained in section 20 of IGRA. (25 U.S.C. § 2719.)  The decision found that taking the Madera site into trust for the purpose of gaming (1) would be in the best interest of North Fork and (2) would not be

34.

detrimental to the surrounding community.  (25 U.S.C. § 2719(b)(1)(A); see 25 C.F.R. § 292.13(c) [two-part determination].)

D.     Tribal-state Compact and Governor's Concurrence

While North Fork's application for the Secretary's two-part determination was under consideration, the Governor and North Fork pursued a tribal-state compact for Indian gaming on the Madera site.  On August 31, 2012, the Governor announced that he had negotiated and signed a compact with North Fork for gaming on the 305-acre parcel and was forwarding the compact to the Legislature for ratification.  The Governor also announced his concurrence in the Secretary's two-part determination that placing the land in trust for North Fork for purposes of class III gaming would be in North Fork's best interest and would not be detrimental to the surrounding community.  The concurrence was set forth in a letter dated August 30, 2012.

E.     IRA Record of Decision:  Fee-to-trust

In November 2012, after the Secretary was informed of the Governor's concurrence, another assistant secretary of Indian affairs issued an IRA record of decision stating the Secretary would exercise the authority granted by section 5 of IRA (25 U.S.C. § 5108) and its implementing regulations (25 C.F.R. § 151) and approve the fee-to-trust application submitted by North Fork for the Madera site.  The decision considered (1) the fee-to-trust application, the draft EIS, the final EIS, public comments, and applicable law; (2) alternatives to the proposed gaming-resort complex, including non-casino alternatives, a reduced casino, and a no-action alternative; and (3) mitigation measures relating to environmental impacts.  Of the various alternatives, the decision concluded the proposed gaming-resort complex was the preferred alternative.

On February 5, 2013, the conveyance of the Madera site into trust was completed, despite the filing of a federal lawsuit challenging the Secretary's decision on the fee-to-trust application.  (See pt. II.H.2., *post*.)

35.

F.      Legislature's Ratification of the Tribal-state Compact

Later in February 2013, Assembly Bill No. 277 (2013-2014 Reg. Sess.) was introduced in the California Legislature to ratify the compact entered into by the Governor and North Fork. By June 2013, Assembly Bill No. 277 had been passed by both houses of the Legislature. The bill was signed by the Governor on July 2, 2013, and became chapter 51 of the Statutes of 2013 (Chapter 51). In addition to ratifying the compact, Chapter 51 exempted the casino project from compliance with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). (Stats. 2013, ch. 51, § 1(b).)

Chapter 51 is noteworthy because it is the first time the Legislature ratified a tribal-state compact for an off-reservation casino. (See *California's First Off-Reservation Casino*, *supra*, 45 McGeorge L.Rev. 521.) Also, "Chapter 51 provides for direct revenue sharing with two specific Tribal Governments for the first time in a gaming compact." (*Id*. at p. 530, fn. omitted.)

Following the Legislature's ratification of the tribal-state compact, it was forwarded to the Secretary. On October 22, 2013, the Secretary published a notice in the Federal Register stating that "the compact is considered to have been approved, but only to the extent that [it] is consistent with IGRA." (78 Fed.Reg. 62649 (Oct. 22, 2013); see 25 U.S.C. § 2710(d)(8)(C).)

G.      Initiative Challenging Chapter 51

On July 8, 2013, while this litigation was pending, Cheryl Schmit submitted a written request to the Attorney General for a title and summary for a proposed statewide referendum rejecting the compact ratification statute, Chapter 51. The Attorney General issued the title and summary, and signatures were gathered. The referendum qualified for the November 2014 general election ballot and was designated Proposition 48. The referendum was phrased so that a "Yes" vote would approve Chapter 51's ratification of two tribal-state gaming compacts, including the North Fork compact.

36.

On November 4, 2014, approximately 4.2 million Californians (61 percent) voted "No" and 2.7 million Californians (39 percent) voted "Yes" on Proposition 48. As a result, the statute ratifying the tribal-state compacts was rejected. (Historical and Statutory Notes, 32E pt. 1 West's Ann. Gov. Code (2016 supp.) foll. § 12012.59, p. 13.)

### H.     Federal Lawsuits

#### 1.     *Good Faith Compact Case*

The voters' rejection of the statute ratifying the August 2012 compact between the State of California and North Fork caused the state to refuse to (1) recognize the existence of a valid tribal-state compact with North Fork and (2) negotiate with North Fork regarding the conduct of gaming on the Madera site. (*Good Faith Compact Case II* (E.D.Cal., Aug. 9, 2016, No. 1:15-CV-00419) 2016 U.S. Dist. Lexis 105825, p. 4.) In 2015, North Fork responded to the state's refusals by filing a lawsuit in the United States District Court for the Eastern District of California and alleging the state violated IGRA by failing to negotiate a compact in good faith. (*Id.*, p. 1; see 25 U.S.C. § 2710(d)(3)(A) ["State shall negotiate with the Indian tribe in good faith"].)

In November 2015, the district court in *Good Faith Compact Case I* addressed competing motions for judgment on the pleadings, concluded the state had failed to enter negotiations as required by federal law, granted North Fork's motion, and ordered the parties "to conclude a compact within 60 days of the date of this order." (*Good Faith Compact Case I*, *supra*, 2015 U.S. Dist. LEXIS 154729, pp. 1, 43–44.) When the parties failed to meet this deadline, the district court appointed a mediator pursuant to 25 United States Code section 2710(d)(7)(B)(iv). (*Good Faith Compact Case II*, *supra*, 2016 U.S. Dist. Lexis 105825, p. 5.) The mediator selected the compact proposed by North Fork and gave the state 60 days within which to consent to that compact. (*Ibid.*) The state did not consent within that period and, consequently, the mediator notified the Secretary that no agreement had been reached. (*Ibid.*; see 25 U.S.C. § 2710(d)(7)(B)(iv).)

On July 29, 2016, as a result of the mediator's notification, the Secretary informed the state and North Fork of the issuance of secretarial procedures for the conduct of class III gaming on North Fork's land. (*Good Faith Compact Case II*, *supra*, 2016 U.S. Dist. Lexis 105825, p. 5.)

In August 2016, the district court in the *Good Faith Compact Case* declined to issue a stay of its judgment, state its order terminated the action in its entirety, and directed the clerk of the court to close the case. (*Good Faith Compact Case II*, *supra*, 2016 U.S. Dist. Lexis 105825, p. 26.)

### 2. Cases Challenging Federal Approvals Under IRA and IGRA

In December 2012, lawsuits were filed in federal district court in Washington, D.C. to challenge the Secretary's approval of North Fork's fee-to-trust application under IRA and the Secretary's two-part determination under IGRA. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d ___, ___ [2016 U.S. Dist. Lexis 119649, pp. 7–8, 29].) These lawsuits also challenged the Secretary's October 2013 approval (by nonaction) of the August 2012 compact between California and North Fork. (*Id*. at p. ___ [2016 U.S. Dist. Lexis 119649, p. 8].)

In September 2016, the district court rejected all challenges to the three separate, but related, federal approvals involving the proposed casino-resort on the Madera site. The challenges included alleged violations of federal environmental statutes, the federal Administrative Procedures Act (5 U.S.C. § 551, et seq.), IRA and IGRA. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d at pp. ___ [2016 U.S. Dist. Lexis 119649, pp. 6–7].) As to the challenge to the validity of the Governor's concurrence—the issue of state law presented in this appeal—the district court refused to consider the challenge, concluding the State of California was an indispensable party that had not been joined in the litigation. (*Id*. at pp. ___ [2016 U.S. Dist. Lexis 119649, pp. 77, 86].)

The district court described the secretarial procedures governing the conduct of class III gaming on the Madera site as follows:

> "The Secretarial Procedures provide that they constitute 'the full and complete authorization by the Secretary of the Interior for the Tribe to conduct class III gaming in its Indian lands pursuant to IGRA,' and 'supersede any prior agreements or understandings with respect to the subject matter hereof.' Secretarial Procedures at 92, 99 (§§ 14.1, 18.2). *The Procedures further provide that, upon their effective date, 'any and all prior tribal-state Class III gaming compacts entered into between the Tribe and the State shall be null and void and of no further force and effect.' Id. at 99 (§ 18.2)."* (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d at p. ___ [2016 U.S. Dist. Lexis 119649, p. 47], italics added.)

I.       <u>Summary:  Current Status of the Concurrence, Compact and Madera Site</u>

The following is my understanding of the current status of (1) the Governor's August 2012 concurrence, (2) the 2012 compact between the State of California and North Fork, and (3) the regulation of gaming on the Madera site.

*1.     2012 Compact*

The compact signed in 2012 has no force or effect. First, California's voters rejected Chapter 51, the Legislature's ratification of the compact. (See pts. II.F. & II.G., *ante*.) Second, the secretarial procedures issued in July 2016, superseded that compact and expressly declared it null and void and of no further force and effect. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d at p. ___ [2016 U.S. Dist. Lexis 119649, p. 47].)

The foregoing conclusion is reinforced by the fact that the parties have agreed in other lawsuits that the 2012 compact "is not in effect and will not govern the North Fork Tribe's gaming operations at the Madera Site." (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, ___ F.Supp.3d at p. ___ [2016 U.S. Dist. Lexis 119649, p. 68].)[18] As

___

[18]     Similarly, in *Good Faith Compact Case I*, the court stated that "it is undisputed that the State and the Tribe have not entered into an enforceable compact" immediately

a result, the district court concluded "the validity of the Compact is simply no longer at issue, and the plaintiffs' claims that are premised upon the Compact's alleged invalidity fail to provide a basis upon which relief can be granted." (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, at p. ___ [2016 U.S. Dist. Lexis 119649, p. 69].)

### 2. 2012 Concurrence

The current status of the Governor's 2012 concurrence in the Secretary's two-part determination is one of the issues raised in this appeal. Here, we unanimously agree, for different reasons, that the 2012 concurrence is invalid under the facts alleged.

### 3. *Gaming on Madera Site*

The current status of class III gaming on the Madera site is uncertain. Part of the uncertainty relates to how the resolution of this lawsuit challenging the validity of the concurrence will impact the force and effect of the secretarial procedures approved in July 2016. Determining this decision's impact on the secretarial procedures involves questions of federal law beyond the scope of the proceedings before us.

## III. INTERPRETING A VOTER INITIATIVE

### A. Standard of Review

Whether the Governor had the authority to concur in the Secretary's two-part determination relating to the Madera site is a question requiring the interpretation of Proposition 1A. The meaning of a voter initiative such as Proposition 1A presents a question of law subject to de novo review. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) Our independent review is guided by the following rules of interpretation.

---

before it decided the motions for judgment on the pleadings filed by the state and North Fork. (*Good Faith Compact Case I*, *supra*, 2015 U.S. Dist. Lexis 154729, p. 22.)

B.      Rules of Interpretation

      1.      *Intent and Voter Understanding*

Whether interpreting a statute adopted by the Legislature or a constitutional provision added by voter initiative, a court's ultimate goal is the same—effectuating the enactors' intent. (*RagingWire*, *supra*, 42 Cal.4th at p. 930 [statute adopted by initiative]; *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 562 [Proposition 13] (*San Mateo*).) Consequently, courts interpreting the scope of a constitutional provision added by initiative *generally* apply the same principles that govern statutory constructions. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 265.) There are a few principles tailored specifically to voter initiatives.

The standard used to determine the "'intent'" of the voters when they adopt an initiative requires the court to place itself in the position of the average voter and determine how the average voter would have understood the proposed constitutional language. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 902; *Legislature v. Eu* (1991) 54 Cal.3d 492, 505; see Elec. Code, § 9087.) In this standard, the average voter is an objectively reasonable person, who is *presumed* to be aware of laws existing at the time the initiative is adopted. (See *Santos v. Brown* (2015) 238 Cal.App.4th 398, 410 [rebuttable presumption that voters are aware of existing laws].) I have located no precedent equating the average voter's *awareness* of an existing law necessarily includes a *detailed knowledge* of the technical definitions contained in existing statutes or court decisions.

      2.      *Words—Ordinary or Technical Meaning*

The task of ascertaining meaning begins with the words of the constitutional provision in question and gives those words their natural and ordinary meaning. (*San Mateo*, *supra*, 10 Cal.4th at p. 562.) Courts construe words in initiatives "according to their ordinary meanings as understood by 'the average voter.'" (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 494 (*Vandermost*).) Stated another way, the people who adopted

a constitutional provision are *presumed* to have understood its words in their ordinary and common sense. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319 (*Steinhart*).)

The foregoing general rule is subject to an exception. Words are given "their natural and ordinary meaning, *unless it appears they were used in some technical sense.*" (*Steinhart*, *supra*, 47 Cal.4th at p. 1318, italics added.) Thus, where a word used in the constitutional provision "'has a popular and also a technical meaning, "the courts will accord to it its popular meaning, unless the very nature of the subject indicates or the context suggests that it is employed in its technical sense."'" (*Turlock Irrigation Dist. v. White* (1921) 186 Cal. 183, 186.)

This exception and the rebuttable presumption that the average voter is aware of laws existing when the initiative is adopted leads to the question of whether the awareness of existing laws extends to technical definitions in those laws. In the civil law context, the California Supreme Court recently stated: "The particularized meaning of words in complex, legislatively enacted statutes has little bearing on the interpretation of words in an initiative .…" (*Vandermost*, *supra*, 53 Cal.4th at p. 494.) Harmonizing these principles about the meaning of words, I conclude that courts interpret words in voter initiatives by giving them their ordinary meaning, unless there is a reasonable basis for inferring that the average voter understood a word or phrase was employed in a particularized or technical sense.

### 3. Historical Context

The inquiry into the average voter's understanding of an initiative is not limited to the provision's text because the electorate does not approve initiatives in a vacuum. (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 542.) The voter understanding of an initiative that amends the California Constitution is discerned by

42.

viewing the initiative's language in its historical context.  (*Ibid*.)  This principle is why the historical context for Proposition 1A was set forth in part I of this opinion.

### 4.  *Ambiguity and the Ballot Pamphlet*

As a general rule, if the language of a constitutional provision is clear and unambiguous, the plain meaning governs.  (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444 (*Silicon Valley*).)  Ambiguous means "susceptible to more than one reasonable interpretation."  (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)  An example of an ambiguity is where a word or phrase has both an ordinary meaning and a technical meaning.

When the language of a constitutional provision is ambiguous, courts consider extrinsic evidence in determining voter understanding, including the Legislative Analyst's analysis and ballot arguments for and against the initiative.  (*Silicon Valley*, *supra*, 44 Cal.4th at pp. 444–445; see Kelso, *California's Constitutional Right to Privacy* (1992) 19 Pepperdine L.Rev. 327, 342, fn. 69 [in a Nov. 1990 telephone poll, 7 out of 10 voters stated voter pamphlets were important to their decision making].)  For instance, in *Legislature v. Eu*, *supra*, 54 Cal.3d at page 505, the California Supreme Court determined what the average voter was likely to conclude Proposition 140 meant based on "reading the proposed constitutional language as supplemented by the [ballot pamphlet's] analysis and arguments."

As to the role of the arguments presented in the ballot pamphlet, our Supreme Court has recognized "the fact that ballot measure opponents frequently overstate the adverse effects of the challenged measure, and that their 'fears and doubts' are not highly authoritative in construing the measure.  (*DeBartolo Corp. v. Fla. Gulf Coast Trades Council* (1988) 485 U.S. 568, 585.)"  (*Legislature v. Eu*, *supra*, 54 Cal.3d at p. 505.)  In other words, the average voter does not naively accept every argument in the ballot

43.

pamphlet as accurate and true.  An argument by the opponents of an initiative about a potential adverse consequence has a greater impact on voter understanding when the proponents fail to contradict that argument.  (*Ibid.*)

### 5.    *Necessary Implications*

The foregoing principles relating to the interpretation of voter initiatives are supplemented by the principles of construction that address implied terms in general and implied powers in particular.

The starting point for determining whether to recognize an implied provision is the general rule that directs the judiciary to "declare what is in terms or in substance contained [in a statute or constitutional provision], *not to insert what has been omitted*, or to omit what has been inserted .…"  (Code Civ. Proc., § 1858, italics added; see *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [courts "may not, under the guise of construction, rewrite the law .…"].)  This general rule is not an absolute ban on implied provisions.  "'[W]hatever is necessarily implied in a statute is as much a part of it as that which is express.'"  (*Johnston v. Baker* (1914) 167 Cal. 260, 264.)  However, implications are *necessary* only in a relatively narrow set of circumstances:

> "As a rule, courts should not presume an intent to legislate by implication.  [Citation.]  'Although in years past it may have been necessary for courts to read into a statute provisions not specifically expressed by the Legislature, the modern rule of construction disfavors such practice.  [Citation.]'  [Citation.]  '"[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied.  'A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.'"'"  (*Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 529 (*Lubner*); see generally 2B, Singer, Sutherland Statutes and Statutory Construction (7th ed. 2012) §§ 55:2, pp. 448–452 [implied effects], 55:3, pp. 452–457 [standards for determining what should be implied].)

This principle of "necessary implication" is compatible with our Supreme Court's statement that "the initiative power is strongest when courts give effect to the voters' formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote." (*RagingWire*, *supra*, 42 Cal.4th at p. 930.)

### 6. Implied Powers

California's approach to implied provisions includes a specific canon of construction for implied grants of power or authority. Generally, courts are reluctant to conclude that the omission of a power was inadvertent and, therefore, should be granted by implication. Our Supreme Court has stated that in grants of power """"there is an implied negative; an implication that no other than the expressly granted power passes by the grant .…"""" (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 196.) Our Supreme Court also has stated that "[i]t is well settled in this state that governmental officials may exercise such additional powers as are necessary for the due and efficient administration of the powers expressly granted by statute .…" (*Dickey v. Raisin Proration Zone* (1944) 24 Cal.2d 796, 810.)

## IV. OFF-RESERVATION CASINOS AND THE POWER TO CONCUR

### A. Wording of Proposition 1A

Proposition 1A added subdivision (f) to section 19 of article IV of the California Constitution. That provision states in full:

> "Notwithstanding subdivisions (a) and (e), and any other provision of state law, *the Governor is authorized to negotiate and conclude compacts*, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes *on Indian lands* in California *in accordance with federal law*. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated *on tribal lands* subject to those compacts." (Italics added.)

This text expressly gives the Governor the authority to negotiate and conclude compacts. The text does not expressly grant the Governor the power to concur in the Secretary's two-part determination relating to class III gaming on off-reservation lands. (25 U.S.C. § 2719(b)(1)(A).) Therefore, the question presented is whether the Governor has an *implied* concurrence power arising from the express grant of the power to negotiate and execute compacts.

B.     The Necessity of an Implied Concurrence Authority

1.     *Trial Court's Ruling*

The trial court's written ruling sustaining the demurrers of North Fork and the state defendants provided that the Governor's power to concur arose by implication from his authority to negotiate and execute tribal-state compacts, as set forth in article IV, section 19, subdivision (f), of the California Constitution. The court concluded: "To hold otherwise would make the phrase 'negotiate and conclude' meaningless, where concurrence is necessary under, for example, the two-part test of 25 U.S.C. section 2719(b)(1)(A)."

2.     *Contentions by State Defendants*

On appeal, the state defendants adopt the trial court's position by arguing "the Governor's concurrence with the Secretary's [two-part] IGRA determination falls within the sphere of his existing compacting authority. (Cal. Const. art. IV, § 19, subd. (f); Gov. Code, § 12012.25, subd. (d).)" In their view, the Governor can "concur in IGRA determinations made by the Secretary when the concurrence is necessary to conclude negotiations under the Governor's compacting powers." Based on this view of the compacting authority, the state defendants conclude:

> "In short, the Governor's concurrence was necessary to complete the North Fork Compact. As the superior court correctly observed, if the Governor did not have the power to grant this concurrence, his powers under article IV, section 19, subdivision (f), to 'negotiate and conclude' *this Compact* would become meaningless." (Italics added.)

46.

This approach to necessity by the state defendants, which is centered on the compact for the Madera site and not the compacting authority in general, is addressed in part IV.B.5., *post*.

### 3. Contention by Plaintiffs

Plaintiffs contend it is factually untrue that the compacting power would be rendered meaningless without the concurrence power. Plaintiffs also contend that the approach to "necessity" adopted by the trial court and the state defendants is contrary to California law because necessity is not evaluated by what is required in the particular, limited circumstances of a case.

Plaintiffs also examine the consequences of the opposing approaches to necessity, contending the ramifications of an implied concurrence authority were not intended.[19] If an implied concurrence power is deemed not necessary to the compacting authority, the Governor would have no implied authority to concur in the Secretary's two-part determination and, consequently, off-reservation land such as the Madera site could not be used for Indian gaming purposes. In effect, the absence of the implied power to concur would prevent the spread of class III gaming to off-reservation lands.[20] (See 25 U.S.C. § 2719(b)(1)(A).) Plaintiffs argue, in effect, that California's voters "were not

---

[19] "As a general rule of statutory construction, courts should consider the consequences that will flow from the various interpretations under consideration. (*Conley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291.) An analysis of the consequences involves evaluating the results generated by a proposed statutory interpretation when it is applied to different factual situations that might arise." (*Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 394-395.) This rule about the consequences of the interpretations considered applies with equal force to constitutional provisions adopted by voter initiative. (E.g., *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [plain meaning of constitutional provision rejected to avoid absurd consequences].)

[20] The absence of a concurrence power would not prevent additional on-reservation casinos or casinos approved for nonconcurrence trust lands because casinos on these types of land do not require a concurrence. (See fn. 1, *ante* [definition of "nonconcurrence trust lands"].)

47.

asked to vote" (*RagingWire*, *supra*, 42 Cal.4th at p. 930) on spreading class III gaming to off-reservation lands under the two-part determination exception and there are no indications of an intent to extend class III gaming to such lands.

### 4. *Necessity in a General Sense*

The parties' contentions raise two legal issues relating to *necessity*. The first involves necessity in a general sense and the second involves necessity for the compact for the Madera site entered in August 2012.

The determination of necessity in a general sense is governed by the following principle of law. "'""A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.'"'" (*Lubner*, *supra*, 45 Cal.App.4th at p. 529.) Thus, for the concurrence authority to be implied, "'there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied.'" (*Woodland Joint Unified School Dist. V. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1451.)

In this case, the Governor's compacting authority would remain fully in effect for potential gaming operations on reservations and other locations qualifying as "Indian lands"[21] even if the Governor has no concurrence authority. The successful exercise of this compacting authority is established by the many gaming compacts entered into by the State of California and various Indian tribes, including the 57 compacts entered into in 1999 and validated by the adoption of Proposition 1A. (See Gov. Code, § 12012.25,

---

[21] The legal questions of whether "Indian lands" is ambiguous and, if so, what meaning should be adopted are irrelevant to my rationale for deciding that an authority to concur is not necessarily implied from the Governor's compacting power. In short, the meaning of the term "Indian lands" is a red herring to resolving the necessity of implying a power to concur. I note, however, the state defendants (1) have not acknowledged that Proposition 1A uses the term "Indian lands" and "tribal lands" interchangeably and (2) have not analyzed whether this use rendered "Indian lands" reasonably susceptible to definitions other than the technical one contained in IGRA. (See 25 U.S.C. § 2703(4).)

subd. (a)(1)–(57).**22** The existing compacts indisputably establish that the Governor's concurrence in a two-part determination by the Secretary is not necessary for the Governor to be able to negotiate and conclude *most* tribal-state compacts. In other words, those compacts have been implemented and stand as examples of the effective exercise of the Governor's compacting authority. Consequently, the Governor's authority to negotiate and conclude compacts is not rendered nugatory (i.e., of no meaningful application) by absence of the authority to concur. Therefore, the concurrence authority is not *necessary* under the legal principle set forth in *Lubner*, *supra*, 45 Cal.App.4th at page 529, because it is reasonable to conclude the concurrence authority (1) was withheld intentionally to prevent the spread of class III gaming under the two-part determination exception or (2) was overlooked because it was not important to the 57 compacts that the proponents of Proposition 1A wanted approved by the state. This conclusion about necessity *in the general sense* is not contested by the state defendants or by the trial court's analysis.

### 5.     *Necessity in a Particular Sense*

The second issue relating to *necessity* is raised by the trial court's determination and the state defendants' argument that an implied power to concur is necessary for the Governor to exercise his powers under article IV, section 19, subdivision (f) of the California Constitution, to "negotiate and conclude" *the compact with North Fork*. The state defendants have cited, and I have located, no legal authority for the principle that necessity is determined by the particular circumstances of a case. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in an appellate brief must, if possible, be supported

---

**22**     The following are a few of the more recent examples of gaming compacts between the State of California and Indian tribes: (1) the February 28, 2013, compact with the Fort Independence Indian Community of Paiute Indians; (2) the December 4, 2013, compact with the Karuk Tribe; and (3) the August 4, 2016, compact with the Agua Caliente Band of Cahuilla Indians. (Gov. Code, §§ 12012.60, 12012.62, 12012.79.)

by citation to authority].)  Accordingly, this approach to *necessity* does not apply the law of California as it currently exists.  Furthermore, the state defendants' novel approach to *necessity* is not supported by reasoned argument.  (See *ibid*. [each point in brief must be supported by argument].)  Consequently, I am not convinced the legal principles defining when an implication is *necessary* should be changed in this case.

Alternatively, I note that the state defendants' approach begs the question of whether the electorate meant to allow off-reservation casinos.  In other words, the state defendants *assume* the Governor has the power to conclude *this compact* and, working backward from this assumption, infer that he must have the power to concur because a concurrence is essential to authorizing a casino on the Madera site.  The last step of this contention is accurate—a concurrence is a necessary condition to the Secretary's approval of a tribal-state compact for Indian gaming on land covered by the two-part determination exception, such as the Madera site.  (25 C.F.R. § 292.23 [consequences of Governor's nonconcurrence]; see 25 U.S.C. § 2710(d)(8) [Secretary's approval or disapproval of compact]; *Keweenaw Bay*, *supra*, 136 F.3d at p. 475 [gubernatorial concurrence and a valid tribal-state compact are both necessary, but not sufficient, conditions for class III gaming on lands covered by two-part determination exception].)[23] Accordingly, I will address the merits of this reverse-engineered view of necessity by examining the state defendants' underlying and unstated assumption—namely, that the voters understood Proposition 1A as authorizing the Governor to approve casinos on sites covered by the two-part determination exception.

---

[23]    In contrast, the discretionary concurrence of a Governor is not required when a proposed casino will be built on reservation lands because, in that situation, the State is not losing jurisdiction over any land.  Consequently, the only State approval required for an on-reservation casino is the tribal-state compact.

C.     Meaning to the Average Voter

As described earlier, courts regard the average voter as an objectively reasonable person who is presumed to be aware of the historical context, including the laws existing at the time the initiative is adopted, and who gives the initiative's words their ordinary meaning unless the context or subject matter shows a term was used in a technical sense. (See part III.B., *ante*.)

*1.     Historical and Legal Context for Proposition 1A*

The average voter, presumed to be aware of existing laws, would have been aware of (1) the controversy involving the spread of casinos outside existing reservations and (2) the differences between the responsibility for entering into compacts with Indian tribes and a Governor's authority to concur in the Secretary's two-part determination. These differences demonstrate that the authority to concur is not part and parcel of the compacting responsibility.

First, the structure of IGRA and the implementing federal regulations show that the compacting responsibility is distinct from the concurrence authority. Tribal-state compacts are addressed in section 11 of IGRA (25 U.S.C. § 2710) and parts 291 and 293 of title 25 of the Code of Federal Regulations. In comparison, the concurrence condition is part of the two-part determination exception set forth in section 20 of IGRA. (25 U.S.C. § 2719(b)(1)(A); see pt. I.D.7., *ante*.) The federal regulations refer to the concurrence condition only in subpart C of Part 292. (25 C.F.R. §§ 292.13–292.25.)[24] Thus, the structure of IGRA and the implementing regulations treat the compacting responsibility as a subject separate from the two-part determination exception and its concurrence condition.

---

[24]     Part 292 deals with the exceptions that allow gaming "on lands acquired by the United States in trust for an Indian tribe after October 17, 1988, if other applicable requirements of IGRA are met." (25 C.F.R. § 292.1.) Subpart C of Part 292 is devoted to the Secretary's two-part determination and the Governor's concurrence in that determination.

Second, the distinction between compacting and concurring is evident from the purpose or function each serves. The tribal-state compact was adopted by Congress as a compromise mechanism to balance the interests of Indian tribal sovereignty and state jurisdiction in controlling class III gaming on Indian lands and, in effect, forces them to share control. (25 U.S.C. § 2710.) Indian sovereignty on tribal lands is respected to the extent that a compact cannot be forced on a tribe. However, tribes wishing to conduct class III gaming must elect to enter into a compact and, thus, share with the state control over the class III gaming on the tribal lands. From the state's perspective, the compact increases its jurisdiction or authority over tribal lands by granting it shared control over the gaming operations conducted on those lands—control that it would not have without a compact.

In contrast, a Governor's concurrence or consent is a requirement of the two-part determination exception, which is one of a handful of exceptions to the general prohibition of class III gaming on after-acquired trust lands. (25 U.S.C. § 2719(b); see pts. I.D.6. & I.D.7., *ante*.) The concurrence condition in not based on the idea of shared sovereignty—the grant, denial or withholding of a concurrence is exclusively within the control of the state. Consequently, the state must give its consent to allow off-reservation gambling on lands covered by the two-part determination exception. The impact on state sovereignty that results from taking land into trust for gaming purposes is much greater than the impact of a tribal-state compact. State sovereignty over the land is diminished when that land goes into trust and the land is removed from the state and local tax base. In contrast, a compact expands state jurisdiction by providing some regulatory control over the gaming operations on Indian lands.

Third, states that have authorized class III gaming within their borders do not have the unfettered right to refuse to enter into a compact with an Indian tribe that requests a compact for gambling on historical tribal lands. IGRA requires such states to enter into a compact and, moreover, provides a mechanism for implementing a tribal-state compact if

52.

the state does not participate in good faith negotiations with the Indian tribe. (25 U.S.C. § 2710(d)(7); see *Seminole Tribe of Florida v. Florida*, *supra*, 517 U.S. at pp. 73–74 [state's duty to negotiate is enforceable through "the carefully crafted and intricate remedial scheme" set forth in IGRA].)

In contrast, IGRA provides no parallel mechanism for forcing a state's Governor to concur in the Secretary's two-part determination. A governor's refusal to concur effectively vetoes the proposal to take land into trust for class III gaming purposes. (See *Boylan*, *supra*, 42 Ariz. St. L.J. at p. 11 ["governor's concurrence authority amounts to a veto or approval"].) Thus, when an electorate withholds from the Governor the power to concur, that withholding acts as a blanket veto of all requests for concurrence in the establishment of off-reservation casinos under the two-part determination exception. Without a grant of concurrence authority, the general prohibition in section 20 of IGRA would apply and prevent the expansion of off-reservation gaming to locations in California such as the Madera site. (25 U.S.C. § 2719(a).)

In sum, the compacting responsibility is distinct from the concurrence authority in many ways—structurally, conceptually, and functionally. An objectively reasonable voter is presumed to have been aware of these distinctions. That voter also would have been aware that IGRA (1) used the concept of tribal-state compacts to deal with questions of Indian sovereignty and state jurisdiction to control and regulate class III gaming, (2) adopted a general prohibition to deal with the controversial issue of off-reservation casinos, and (3) employed an intricate set of exceptions to the general prohibition to address specific concerns about unequal treatment among the tribes. One of those exceptions was conditioned upon obtaining the concurrence of the Governor in the Secretary's two-part determination. With the foregoing awareness, an average voter would have understood the relationship between the Governor's power to concur and off-reservation casinos.

Having established the average voter's state of awareness, I turn to the question of how that voter would have understood the text of Proposition 1A and the ballot pamphlet.

### 2. *Text of Proposition 1A*

I first consider what understanding the average voter would have reached after reading the text of Proposition 1A. The voter would have seen from the text that Proposition 1A dealt with the issue of which state official is responsible for negotiating the tribal-state compact by granting the Governor of the authority to negotiate and conclude compacts, subject to ratification by the Legislature. This issue arises because IGRA simply refers to negotiations *with the state* and does not designate which state official is responsible for negotiating the tribal-state compact. (See 25 U.S.C. § 2710(d)(3).) The text of Proposition 1A also deals with another of IGRA's unresolved issues by identifying the type of games that may be offered and regulated under a tribal-state compact.

Voters also would have seen that the text of Proposition 1A does not expressly (1) grant or withhold the authority to concur in the Secretary's two-part determination or (2) fauthorize or prohibit class III gaming on off-reservation lands. In the face of this silence, the voter would turn to the ballot pamphlet to see whether its contents addressed the issue of the concurrence power or, more generally, the controversial issue of off-reservation casinos.

### 3. *Summary and Analysis in Ballot Pamphlet*

The official title given to Proposition 1A by the Attorney General was "Gambling On Tribal Lands. Legislative Constitutional Amendment."[25] (Some capitalization

---

[25] The Attorney General chose to use the term "tribal lands" instead of "Indian lands," a term defined by IGRA. An interpretation that adopts IGRA's technical definition of "Indian lands" would render the Attorney General's choice of title, the use of the term "tribal lands" in the text of Proposition 1A, and the many references to "tribal lands" in the ballot pamphlet misleading because the ordinary meaning of "tribal lands" differs from IGRA's definition. (See fn. 21, *ante*.) Deciding the meaning of "Indian

54.

omitted.) The summary prepared by the Attorney General made no mention of the concurrence authority. (See pt. I.G.1., *ante*.) Similarly, it did not mention off-reservation casinos.

The analysis provided by the Legislative Analyst[26] mentioned neither the concurrence authority nor whether the proposition would allow off-reservation casinos in California. The analysis included four paragraphs describing the fiscal effect of Proposition 1A on state and local revenue. The description of fiscal effects contained a notable omission. It did not state that revenue from real estate taxes would be reduced when land was removed from the state and local tax base as a result of being taken into trust for Indian gaming purposes. (See 25 U.S.C. § 5108.) This omission suggests that the analyst thought Proposition 1A would not result in land being removed from the tax base and, thus, no reduction in revenues from real estate taxes would occur. (Elec. Code, § 9087, subd. (a) [analysis shall describe any decrease in revenue to state or local government].) Thus, a voter reading the pamphlet would infer that Proposition 1A would not result in the acquisition of land in trust for purposes of Indian gaming and, as a result, would infer that the Governor would not be authorized to concur in the Secretary's two-part determination. Stated from another perspective, the analysis of the Legislative Analyst did not indirectly inform voters of the possibility of off-reservation casinos by telling them of the removal of land from the state and local tax base.

In sum, the analysis of the Legislative Analyst does not inform voters that Proposition 1A would (1) grant the Governor the power to concur in the Secretary's two-

---

lands" is irrelevant to my rationale for deciding that the authority to concur does not arise by necessary implication from the Governor's compacting authority.

[26] California statute directs the Legislative Analyst to "prepare an impartial analysis of the measure describing the measure and including a fiscal analysis …." (Elec. Code, § 9087, subd. (a).) The analysis "shall generally set forth in an impartial manner the information the average voter needs to adequately understand the measure." (*Id*., subd. (b).)

part determination, (2) allow class III Indian gaming to spread to off-reservation locations, or (3) remove land from the state and local tax base. If Proposition 1A is construed to allow casinos on land covered by the two-part determination exception, the analysis of the Legislative Analyst did a woefully inadequate job of informing the average voter of that consequence.

### 4. Arguments in Ballot Pamphlet

The arguments in favor and against Proposition 1A and the rebuttals to those arguments did not explicitly mention the concurrence authority. As to whether casinos might be operated on after-acquired trust lands, the proponents and opponents presented different positions about the effect of Proposition 1A.

The proponents took a narrow view of Proposition 1A, stating they sought approval of "Proposition 1A so we can keep the gaming we have on our reservations." (Voter Information Guide, *supra*, argument in favor of Prop. 1A, p. 6.) In contrast, the opponents stated: "Proposition 1A and the Governor's compact with gambling tribes will trigger a massive explosion of gambling in California." (Voter Information Guide, *supra*, argument against Prop. 1A, p. 7.) Under the opponents' interpretation of Proposition 1A: "Casinos won't be limited to remote locations. Indian tribes are already buying up prime property for casinos in our towns and cities." (Voter Information Guide, *supra*, argument against Prop. 1A, p. 7.) The proponents' rebuttal disagreed with this interpretation of Proposition 1A and included the following quote from Carl Olson, former federal field investigator of NIGC: "Proposition 1A and federal law strictly limit Indian gaming to tribal lands. The claim that casinos could be built anywhere is totally false."[27] (Voter Information Guide, *supra*, rebuttal to argument against Prop. 1A, p. 7.)

---

[27] This statement refers to "tribal lands" rather than using the term "Indian lands" or "Indian country," both of which have particularized meanings under federal statutes. (See 18 U.S.C. § 1151 ["'Indian country'"]; 25 U.S.C. § 2703(4) ["'Indian lands'"].)

56.

To summarize their positions, the proponents and opponents did not address the technical matter of whether the Governor had concurrence authority, but phrased their arguments in terms of where casinos could be located. As to the potential locations of casinos, they disagreed.

Faced with this disagreement between the proponents and the opponents of Proposition 1A, the impact of conflicting arguments in the ballot pamphlet on the understanding of the average voter should be considered. As discussed in part III.B.4., *ante*, the average voter recognizes that ballot measure opponents frequently overstate the adverse effects of the challenged measure. As a result, the opponents' expressions of fears are not highly authoritative, particularly when proponents contradict the opponents' argument about a particular consequence, as was done here. (See *Legislature v. Eu*, *supra*, 54 Cal.3d at p. 505.) Accordingly, I conclude that the opponents' argument about casinos being located in towns and cities is not necessarily how the average voter would have understood Proposition 1A and, by extension, would have understood that off-reservation casinos could be built in California.

    5.     *"On Indian lands in California in accordance with federal law"*

The state defendants' textual argument for why Proposition 1A grants the Governor the power to concur is based on the last three prepositional phrases of the first sentence of article IV, section 19, subdivision (f), of the California Constitution. They argue that "on Indian lands in California in accordance with federal law" plainly refers to federal law and, thus, IGRA's definition of "'Indian lands.'" (25 U.S.C. § 2703(4).) That definition includes "all lands within the limits of any Indian reservation" and "any land title to which is either held in trust by the United States for the benefit of any Indian tribe or individual …." (*Ibid.*) The state defendants contend IGRA's definition is not exclusively limited to lands acquired in trust before 1988, but allows lands to become Indian lands even if acquired in trust after 1988.

In my view, the issues involving the interpretation of the term "Indian lands" are irrelevant to deciding whether an authority to concur is necessarily implied from the Governor's compacting power. (See fns. 21 & 25, *ante*.) Assuming IGRA's technical definition of "Indian lands" is the appropriate way to interpret Proposition 1A's use of that term, it does not follow that the power to concur is a necessary implication of power to compact. As explained earlier, the compacting responsibility is distinct from the concurrence authority in many ways—structurally, conceptually, and functionally. As a result, the compacting responsibility can be meaningfully executed without a concurrence authority. Furthermore, the omission of a grant of the concurrence authority is a rational way to prevent the spread of class III gaming to sites covered by the two-part determination exception. Alternatively, if the omission was not made for the purpose of limiting the spread of casinos, the omission may have been designed to leave unaddressed a matter that was not important to the 57 compacts that the proponents of Proposition 1A wanted approved by the state. If this were the case, the proponents omitted the authority to concur in the Secretary's two-part determinations to avoid the risk that Proposition 1A would be defeated because it addressed an issue unimportant to the proponents' main goal.

In short, whatever interpretation is given the prepositional phrases "on Indian lands in California in accordance with federal law" in Proposition 1A, those phrases did not inform the average voter that Proposition 1A impliedly granted the Governor the power to concur in the Secretary's two-part determination.

### 6. *Identity of Proponents*

Next, I consider the possibility that the average voter was alerted to the possibility that Proposition 1A allowed Indian gaming to expand to off-reservation sites by virtue of who acted as proponents for the measure.

The ballot pamphlet identified the argument in favor of Proposition 1A as being presented by the chairmen of three tribes. Those tribes had tribal-state compacts that the passage of Proposition 1A approved. (See Gov. Code, § 12012.25, subd. (a)(31), (a)(36) & (a)(56) [Pechanga Band of Luiseno Indians, Rumsey Band of Wintun Indians, and Viejas Band of Kameyaay Indians].) Thus, the proponents were interested in the approval of on-reservation class III gaming and may have been indifferent or actually opposed to the competition that would result from allowing off-reservation casinos in California. Furthermore, neither the parties nor I have identified a single compact among the 57 compacts approved by Proposition 1A that required the Governor's concurrence in a two-part determination by the Secretary. Accordingly, the identity of the proponents of Proposition 1A and those benefited by the approval of the 57 compacts mentioned to in the ballot pamphlet did not provide the average voter with a basis for inferring that Proposition 1A allowed Indian gaming to expand to off-reservation lands pursuant to under the two-part determination exception.

### 7. *Conclusion*

First, the text of Proposition 1A plainly omits the power to concur in the Secretary's two-part determination. Second, an implied grant of that power is not necessary under the principles of California law that govern necessary implications. Third, the wording of Proposition 1A and the materials in the ballot pamphlet did not inform the average voter that approving Proposition 1A would grant the Governor the power to concur or, more generally, would grant the Governor the authority to either veto or approve a proposed off-reservation casino. Fourth, expanding Indian gaming to off-reservation locations was and is a controversial question of public policy with a wide range of consequences, and it is implausible that the average voter would have understood that Proposition 1A granted the Governor an implied authority to concur and

59.

thereby allowed off-reservation casinos.  The controversy should not be resolved by implication when the voters were not informed that such an implication existed.

"For a court to construe an initiative statute to have substantial unintended consequences strengthens neither the initiative power nor the democratic process; the initiative power is strongest when courts give effect to the voters' formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote."  (*RagingWire*, *supra*, 42 Cal.4th at p. 930.)  Bluntly stated, California's voters were not asked to vote on the concurrence power.

V.      EXECUTIVE AUTHORITY OF THE GOVERNOR

      A.      Contentions of the Parties

Plaintiffs' opening brief addresses the possibility that the state defendants would argue that the authority to concur in the Secretary's determination is inherent in the Governor's executive power to "see that the law is faithfully executed."  (Cal. Const., art. V, § 1.)  Plaintiffs counter this possibility by (1) noting that the trial court rejected the argument and (2) asserting that the power to create new Indian law for purposes of gaming is a legislative power that the Governor cannot exercise without explicit constitutional or statutory authority.

The state defendants' response does not include an *inherent*-executive-authority argument.  Instead, they contend that because the Governor concurred under his existing executive powers, he did not unconstitutionally exercise legislative authority.  The state defendants identify the source of the existing executive power to concur with the Secretary's two-part determination as article IV, section 19, subdivision (f), of the California Constitution and section 12012.25 of the Government Code.

B.      Inherent Executive Authority

    1.      *Broader Rationale*

My analysis of inherent executive authority contains broader conclusions than the analysis set forth in the lead opinion.  In other words, I have resolved questions of law not reached by the lead opinion.

My analysis begins with the general grant of executive power to the Governor, which is set forth in article V, section 1 of the California Constitution:  "The supreme executive power of this State is vested in the Governor."  In my view, when the phrase "supreme executive power of this State" is harmonized with the constitutional provisions expressly addressing casino-type gambling, that general executive authority does not encompass the power to provide the concurrence referenced in section 20 of IGRA.  (See 25 U.S.C. § 2719(b)(1)(A).)

The California Constitution contains a general prohibition of all casino-type gambling statewide.  (Cal. Const., art. IV, § 19, subd. (e).)  The faithful execution of this general prohibition cannot extend to acts that would have the effect of expanding casino-type gambling in California *unless such acts are authorized elsewhere* in the Constitution.  A harmonious interpretation of the Constitution requires that executive action conflicting with a general constitutional prohibition must be expressly authorized to be valid.

Here, the voters adopted a specific exception to the general prohibition of casino-type gambling when they approved Proposition 1A.  That specific exception addresses the topic of tribal-state gaming compacts authorized by IGRA and, more particularly, the Governor's authority with respect to such compacts.  The voters chose to adopt language that does not grant the Governor the authority to concur.  That choice should not be undone by an expansive reading of the executive power.  The state defendants have not so argued.  Thus, I do not interpret the Governor's general executive power as inherently authorizing him to take the specific step of concurring in the Secretary's two-part

61.

determination. Another way of stating this conclusion is that the field of casino-type gambling in California has been fully occupied by the provisions in section 19 of article IV of the California Constitution and the authority for any state action that furthers casino-type gambling in California must be rooted in subdivision (f) of section 19 of article IV.

In addition, the foregoing view of inherent executive authority is not contradicted by Californian or Anglo-American legal tradition. The Secretary's two-part determination did not exist prior to the 1988 adoption of IGRA and, thus, the possibility of a Governor concurring in that determination is not addressed by tradition.

### 2.	*Third District's Decision*

On October 13, 2016, in *United Auburn Indian Community of the Auburn Rancheria v. Brown* (2016) 4 Cal.App.5th 36 (*United Auburn*), the Third District "concluded that the power to concur was executive, rather than strictly legislative, and that by exercising the power the Governor did not violate the separations of powers clause of the state Constitution." (*Id*. at p. 52, fn. 3.) The court explicitly stated that it did not reach the issue of whether the Governor's concurrence was necessary and incidental to his powers to negotiate and execute a class III gaming compact. (*Ibid*.)

I note the Third District did not address whether an inherent executive power to concur *conflicts with the ban on casinos in subdivision (e) of section 19 of article IV of the California Constitution*. In addition, the court did not address the narrower question presented by the facts of this case—an inherent executive authority validating a concurrence related to a tribal-state compact that has been rejected by the voters of California.

Thus, strictly speaking, the conclusion reached here about the Governor's executive power not validating the August 2012 concurrence does not conflict directly with the rationale expressed by the Third District. (See *Loeffler v. Target Corp.* (2014)

62.

58 Cal.4th 1081, 1134 [cases are not authority for propositions not considered or decided].) Nonetheless, the outcome of this case conflicts with the outcome reached by the Third District when it affirmed the judgment of dismissal entered after a demurrer was sustained to a complaint challenging the validity of a Governor's concurrence relating to land in Yuba County. This conflict might be a reason for the California Supreme Court to grant review.

## VI. IMPLIED RATIFICATION OF CONCURRENCE

I agree with the conclusion stated in part IV.B. of the lead opinion that the voters' rejection of the Legislature's ratification of the compact means the Legislature's ratification does not operate to validate the August 2012 concurrence. My reasons for joining that conclusion go beyond those stated in the lead opinion. Specifically, I conclude the Legislature cannot validate the Governor's concurrence because there is no constitutional or other basis for issuing a concurrence in the first place. The Governor's August 2012 concurrence was void *ab initio*. Any purported ratification by the Legislature of a void concurrence also would violate the California Constitution.

## VII. NONBINDING GUIDANCE FOR THE TRIAL COURT

### A.    Construing the Opinions

#### 1.    *Law of the Case*

The disposition of this appeal requires further proceedings on remand. Those proceedings will be affected by the doctrine of law of the case. (See generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 459–480, pp. 515–540.) Under that doctrine, when an appellate court states a principle or rule of law necessary to its decision, that principle or rule becomes the law of the case and must be adhered to in subsequent proceedings, both in the trial court and upon subsequent appeal. (*Tally v. Ganahl* (1907) 151 Cal. 418, 421.) The doctrine applies only to an appellate decision on a question of law.

63.

Precisely what questions of law have been decided by this court in a way that is binding in further proceedings might generate disagreement on remand. Therefore, to provide some guidance for counsel and the trial court in those proceedings, I set forth my understanding of the legal issues that have been decided in this appeal and the legal issues that remain "at large,"—that is, are not subject to a binding decision by this court and remain for the trial court to decide in the first instance.

2.      *Scope of Agreement with Lead Opinion*

I agree with Part I of the lead opinion and the legal conclusions in footnote 4 of Part II of the lead opinion that (1) the Governor's authority to concur must come from state, not federal, law and (2) the source of that authority must be the constitutional provision added by Proposition 1A and not a statute.

As to Part III of the lead opinion, I agree with the ultimate conclusion that the Governor "cannot exercise an implied power [to concur] in a case where the voters have vetoed an exercise of the express power on which the implied power was based," but have decided questions of law that provide a broader rationale for this ultimate conclusion.

As to part IV.A. of the lead opinion, I agree with the ultimate conclusion that the Governor's inherent executive authority does not validate the August 2012 concurrence, but have concluded that there is never an inherent executive authority to concur because the subject of casino gambling is addressed exclusively by article IV, section 19, subdivisions (e) and (f) of the California Constitution and the inherent executive authority cannot be used to implement off-reservation gambling not authorized by Proposition 1A. I also agree with the lead opinion's rationale and ultimate conclusion relating to Government Code section 12012 and article V, section 4 of the California Constitution.

As to part IV.B. of the lead opinion, I agree with the ultimate conclusion that there was no implied ratification of the Governor's August 2012 concurrence by the

Legislature, but have concluded that the Governor's concurrence was void *ab initio* and, thus, could not be made valid by an implied ratification by the Legislature.

As to part V of the lead opinion, I agree with the conclusion that the claims are not moot. My rationale is broader in that I conclude effective relief is available to plaintiffs in the form of (1) a writ of mandate directing the Governor to set aside the invalid concurrence and (2) declaratory judgment stating that the concurrence was void *ab initio*. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574 [controversy is not moot if the court can grant the plaintiff any effectual relief].)

B.  Causes of Action

On remand, the most practical questions concern (1) the cause or causes of action that the plaintiffs will be allowed to pursue and (2) the elements of the cause or causes of action. The disposition provides that plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. A majority has not been able to agree on the particular legal grounds for the conclusion that the Governor lacked the legal authority to concur under the facts of this case, which creates uncertainty about (1) the elements that must be proven to establish plaintiffs' cause or causes of action and (2) the relief obtainable.

1.  *Three Opinions, Three Legal Theories*

When reviewing a demurrer, appellate courts decide whether the complaint has stated a cause of action under *any legal theory*. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) In this appeal, each of the three opinions has adopted a different legal theory for why a cause of action has been stated. Each legal theory has different elements. The following is my understanding of what those elements are.

The lead opinion concludes the Governor has no authority to concur when the proposed casino would be operated under authority other than a state-approved compact. Under this legal theory, the elements plaintiffs must prove to be entitled to relief are (1)

65.

the issuance by the Governor of a concurrence related to the Madera site and (2) the absence of a state-approved compact for the Madera site. Here, that absence was brought about when California's voters rejected the statute ratifying the tribal-state compact. If these elements are proven, the August 2012 concurrence would be invalid under the legal theory adopted in the lead opinion.

My understanding of Justice Detjen's opinion is that the Governor lacks the authority to concur when the Governor has not properly exercised the compacting authority, such as when the compact in question relates to a site that was not Indian land when the compact was negotiated and concluded.[28] Under this legal theory, plaintiffs must prove that (1) the Governor negotiated and concluded a compact for the Madera site (2) when that site was not held in trust for North Fork (or otherwise was Indian land as that term is defined in IGRA) and (3) the Governor issued a concurrence related to or connected with that compact. If these elements are proven, the concurrence would have been void *ab initio*.

Under the legal theory I have adopted, the Governor has no power to concur in any two-part determination made by the Secretary. Therefore, any issuance of a concurrence by the Governor violates California law. Upon proof that the Governor issued a concurrence in a two-part determination, plaintiffs will be entitled to a declaratory judgment stating the concurrence was void *ab initio* and a writ of mandate directing the Governor to set aside and vacate the concurrence.

On remand, the trial court will be required to decide which of the three legal theories plaintiffs will be allowed to pursue. We have not been able to agree on the test

---

**28** Timeline of the events: (1) September 2011—the Secretary issues a two-part determination under IGRA for the Madera site; (2) August 2012—the Governor and tribe complete a compact and the Governor issues a concurrence in the Secretary's two-part determination; (3) November 2012—the Secretary decides to take the Madera site into trust under IRA; and (4) February 2013—the Madera site is conveyed into trust.

66.

that the trial court should use in interpreting our opinions, but one approach to an appellate decision, where a two-justice majority has not adopted a single rationale explaining the result, is to interpret the holding as being on the narrowest grounds that supports the judgment (i.e., the disposition). (See *Marks v. United States* (1977) 430 U.S. 188, 193.) This approach will work in situations where the trial court determines that one legal theory is the logical subset of another, broader legal theory. (See *People v. Dungo* (2012) 55 Cal.4th 608, 628 [conc. opn. of Chin, J.].)

I recommend that the trial court *consider* (1) avoiding the inquiry into the narrowest common ground that creates a two-justice majority and (2) going forward on all three legal theories. Proof of elements of each legal theory appears to be relatively straightforward and it may be efficient for the trial court to consider and decide all of the theories at once, rather than risk the possibility of a later remand for further proceedings on an omitted theory. The trial court also might find it efficient to state separately the relief obtained under each theory or, alternatively, if the relief granted is identical under each theory, to explicitly state that conclusion. If the trial court rejects these suggestions, it might have to analyze whether the conclusion reached by the Third District in the section of its opinion titled "Negotiating Before Land Was Taken into Trust" is binding precedent that precludes the trial court from applying the legal theory recognized by Justice Detjen. (*United Auburn*, *supra*, 4 Cal.App.5th at p. 53.)[29]

---

[29]     In addition to the discussion in *United Auburn*, the sequence of the various federal approvals or actions was described by a federal district court. That description is quoted in part I.D.8., *ante,* and states that the Secretary's decision to take land into trust under IRA is made after a Governor has concurred in the Secretary's two-part determination. Thus, the sequence of the federal decisions, when joined with an interpretation of Proposition 1A that requires a particular site be taken into trust under IRA *before* the Governor may negotiate a tribal-state compact and issue a concurrence, appears to create a Catch 22. The catch is that the Secretary will not approve the acquisition of trust land without the concurrence of the Governor and the Governor's authority to concur (as well as the authority to compact) is conditioned upon the land being held in trust.

Out of caution, I note there may be additional legal theories for the proposition that, under the facts of this case, the Governor lacked the authority to concur that are not addressed by our opinions. I believe any theories not so addressed would be "at large" on remand and, as a result, the trial court would decide in the first instance the legal questions of (1) whether California recognized a cause of action under any such legal theories, (2) of the elements of any such cause of action, and (3) the relief that might be obtained.

C.     Inherent Executive Authority

All three justices agree in the conclusion that, under the facts alleged in this case, any inherent executive authority that the Governor might have does not validate the Governor's August 2012 concurrence. Also, as addressed in part V.B.2., *ante*, the opinions in this case decide legal issues that were not addressed by the Third District in *United Auburn*, *supra*, 4 Cal.App.5th 36. Thus, I believe that neither the conclusion nor

One consequence of this catch might be to bar, in effect, the building and operation of casinos on sites in California that require a concurrence—a consequence consistent with the broader interpretation adopted in this opinion. Alternatively, the Secretary might alter its usual procedures to work around the catch for proposed casinos in California. As to situations not presented in this case—namely, the application of the exceptions contained in section 20 of IGRA that do not involve a two-part determination and a Governor's concurrence, interpreting Proposition 1A to contain a temporal condition creates another set of complexities and, depending upon how federal law is applied, may lead to unintended consequences. Those other exceptions still require a tribal-state compact. If the land to which those exceptions are being applied is not yet held in trust, the Governor will not have the authority to negotiate a compact. The Governor's inability to negotiate compacts for lands not yet held in trust might be considered a violation of IGRA's requirement for good faith negotiations. (See *KG Urban Enterprises, LLC v. Patrick* (lst Cir. 2012) 693 F.3d 1, 23 ["Secretary's views on whether the tribal-state compacts may be approved before the tribe possesses land that is taken into trust have varied over the years."].) Such a violation might lead to casinos operating under secretarial procedures, rather than a tribal-state compact—a result that was not disclosed to the voters and is unlikely to have been understood by them. (See *RagingWire*, *supra*, 42 Cal.4th at p. 930 [judicial constructions of voter initiatives that "have substantial unintended consequences" are not preferred].)

the rationale adopted in *United Auburn* about the scope of the Governor's executive powers is binding on the further proceedings to be conducted on remand.

Moreover, Justice Detjen and I agree that the ban on casinos set forth in subdivision (e) of section 19 of article IV of the California Constitution prevents the Governor from having the inherent executive authority to concur in the Secretary's two-part determination. I believe this two-justice majority resolves a question of law in a manner that will become law of the case unless the California Supreme Court grants review in this appeal.

_____

FRANSON, J.